**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

FLORIDA MEDICAL ASSOCIATION,
INC., et al.,

        Plaintiffs,

vs.                                   Case No. 3:78-cv-178-J-34MCR

DEPARTMENT OF HEALTH, EDUCATION,
& WELFARE, et al.,

        Defendants,

DOW JONES & COMPANY, INC., et al.,

        Intervening Defendants.

_____

## ORDER

      The issue presented in this case is whether an injunction, entered some 33 years ago,

which permanently enjoins the United States Department of Health and Human Services

("HHS") "from disclosing any list of annual Medicare reimbursements amounts, for any years"

that identifies providers of services under Medicare, should be vacated or modified because

continued prospective application "is no longer equitable."  Rule 60(b)(5), Federal Rules of

Civil Procedure (Rule(s)); see Alley v. U.S. Dep't of Health and Human Servs., 590 F.3d

1195, 1209-10 (11th Cir. 2009).  The issue is brought to the Court by Intervenors Jennifer D.

Alley and Real Time Medical Data Inc.'s Motion to Vacate Permanent Injunction (Doc. 55;

RTMD Motion), and Intervenor Dow Jones & Company, Inc.'s Motion to Vacate Permanent

Injunction.  (Doc. 56; Dow Jones Motion).  The issues have been extensively briefed,[1] and

the parties have submitted evidence in support of their respective positions.[2]  The Court

heard oral argument on June 20, 2012, (Doc. 65; 06/20/12 Clerk's Minutes), the transcript

of which is incorporated herein.  (Doc. 66; Tr.).  Additionally, on August 20, 2012, the parties

filed post-hearing briefs.

## I.   Background

### A.   District Court Proceedings Leading to the Entry of the Permanent Injunction[3]

In March 1977, the Secretary of the United States Department of Health, Education

and Welfare,[4] the agency responsible for administering Medicare, released a list identifying

---

[1]   See Opposition of Plaintiffs American Medical Association and Florida Medical Association to Intervenors' Motions to Vacate Permanent Injunction (Doc. 57; AMA and FMA Response); Response of Defendants Department of Health and Human Services and Kathleen Sebelius in Partial Support of Intervenors' Motion to Vacate Permanent Injunction (Doc. 58; HHS Response); Reply of Plaintiffs American Medical Association and Florida Medical Association to Response of Defendants Department of Health and Human Services and Kathleen Sebelius in Partial Support of Intervenors' Motions to Vacate Permanent Injunction (Doc. 59; AMA and FMA Reply); Dow Jones & Company, Inc.'s Reply in Support of Motion to Vacate Permanent Injunction (Doc. 61; Dow Jones Reply); Reply in Support of Motion to Vacate Permanent Injunction (Corrected) by Intervenors Jennifer D. Alley and Real Time Medical Data Inc. (Doc. 62; RTMD Reply); Supplemental Brief of Plaintiffs American Medical Association and Florida Medical Association, Inc. in Opposition to Intervenors' Motions to Vacate Permanent Injunction   (Doc. 68; AMA and FMA Supplement); Supplemental Memorandum of Defendants Department of Health and Human Services and Kathleen Sebelius in Partial Support of Intervenors' Motions to Vacate Permanent Injunction (Doc. 69; HHS Supplement); and Dow Jones & Company, Inc.'s Supplemental Memorandum in Support of Motion to Vacate Permanent Injunction (Doc. 70; Dow Jones Supplement).

[2]   See Docs 1-2; 1-3; 55-1; 56-1 (and attached exhibits); 57 at 39-109; 59 at 24-130.

[3]   The Court's prior Order permitting intervention (Doc. 43; Intervention Order), which is incorporated into this Order, recounts certain facts and the procedural history bringing the case to its current posture.

[4]   The Department of Health, Education, and Welfare ("HEW") has been re-designated as the Department of Health and Human Services ("HHS"), and the Secretary of HEW has been re-designated as Secretary of HHS.  See 20 U.S.C. § 3508.  Kathleen Sebelius, Secretary of HHS, is substituted as a Defendant in her official capacity, pursuant to Rule 25(d), Federal Rules of Civil Procedure.  In this
(continued...)

physicians or groups of physicians who received $100,000.00 in Medicare reimbursements

in 1975.  See Fla. Medical Ass'n., Inc. v. Dep't of Health, Education, and Welfare, 479

F.Supp. 1291, 1297 (M.D. Fla. 1979); see also Alley, 590 F. 3d at 1198.  The disclosure,

which was widely publicized, also correlated the gross reimbursements for 1977 Medicare

claims with the name of each physician identified.  479 F.Supp. at 1297.  The information

published was later found to be "inaccurate in many ways." Id.

> Also in March, 1977, the Secretary published in the Federal Register (42
> Fed.Reg. 14703) an interim amendment to the rules for disclosure of Social
> Security records, contained in 20 C.F.R. s 401.1 Et seq., in order to conform
> the current regulations to the most recent requirements of the Freedom of
> Information Act.  The effect of the amendment to 20 C.F.R. s 401.1 Et seq. was
> to adopt the principles of the Freedom of Information Act as guiding rules for
> the disclosure of information by [HHS], 42 Fed.Reg. at 14704.  See 20 C.F.R.
> s 401.3(a).

Id.  Then, in November 1977, the Secretary directed its carriers to publish another list, this

time identifying all physicians and providers who received medicare reimbursements in 1977.

Id.

> The list was to include full names of the physicians and their
> providers, their addresses, the net total amount of Medicare
> reimbursement paid [directly] . . . to each physician or provider,
> and the net total amount of Medicare reimbursements paid to
> beneficiaries for . . . services furnished by each physician or
> provider.

Id.  On March 24, 1978, Plaintiff Florida Medical Association (the "FMA") and six individual

physicians, on behalf of all Florida physicians whose patients were Medicare beneficiaries,

---

[4](...continued)
Order, the Court will simply refer to both HHS and its predecessor, HEW, as HHS.

filed suit to enjoin the scheduled disclosures. Alley, 590 F. 3d. at 1198, 99; Doc. 59 at 94-100

(FMA Complaint)).  The FMA described the contested information as follows:

> Detailed information on the amount of "assigned" Medicare payments made directly to individual physicians and "unassigned" payments made to individual Medicare beneficiaries on account of physician services are contained in a system of records maintained by defendants Blue Shield and Group Health, Inc., under the control and direction of HEW and the Secretary.  The information contained in this system  of records is retrievable by the names of individual physicians or groups or physicians, or by some identifying number or symbol particularly assigned to individual physicians or groups of physicians.

FMA Complaint ¶ 11.

In the FMA Complaint, the FMA invoked the Court's jurisdiction stating that its claims

arose "under the Freedom of Information Act, 5 U.S.C. § 552 ["FOIA"], the Privacy Act of

1974, 5 U.S.C. § 552a, 18 U.S.C. § 1905 [the Trade Secrets Act], and the First, Fourth, Fifth

and Fourteenth Amendments to the Constitution of the United States." Id. ¶ 1.  It asserted

that in 1977, HHS made public the names of physicians or physician groups whose billing

exceeded $100,000 or more in Medicare payments in 1975, id. ¶ 12, and that HHS had

announced an intention to make additional similar disclosures on April 30, 1978. Id. ¶¶ 13-

18.  Alleging that further release of such information would violate FOIA, the Privacy Act, the

Trade Secrets Act, and the United States Constitution, the FMA Plaintiffs requested that the

Court declare "that the threatened disclosure of Medicare payments made on account of

billings by members of the class" would be unlawful, and asked the Court to preliminarily and

permanently enjoin HHS from disclosing this information. See FMA Complaint at 7; see also

Alley, 590 F.3d at 1199.

On April 28, 1978, the Court entered a Temporary Restraining Order, which the parties agreed would remain in place until the Court resolved the case, or June 6, 1978, whichever occurred first. <u>See</u> 479 F.Supp. at 1295.[5]  The Court referred the Motion for Preliminary Injunction to the Magistrate Judge who issued findings and recommendations, and the parties filed written objections. <u>Id.</u>  On May 16, 1978, the Court heard argument concerning those objections. <u>See id.</u>  Having filed cross motions for summary judgment, the parties stipulated that the Court should "consolidate its ruling on the merits in this case with its consideration of Plaintiff's Preliminary Injunction Motion." <u>Id.</u>  Subsequent to that hearing, on June 12, 1978, the Court permitted the American Medical Association ("AMA") to intervene on behalf of its more than 200 licensed physician members nationwide. <u>Id.</u>  As such, the Court recertified the class to include all physicians licensed to practice in Florida and all members of the AMA, if they were providers of Medicare services and would be individually identified by the disclosure of annual medicare reimbursement amounts. <u>Id.</u> at 1295-96.

After giving the parties additional time to submit memoranda, the Court was faced with the possibility that its subject matter jurisdiction might be extinguished if the Temporary Restraining Order expired, and HHS disclosed the information at issue, before the entry of an order resolving the matter. <u>See id.</u> at 1296.  As such, the Court issued "what it termed 'an Ancillary Writ of Injunction,'" which the Fifth Circuit Court of Appeals vacated, after concluding that neither the Court's ancillary jurisdiction, nor the All Writs Act, authorized a district court to disregard the requirements of Rule 65 of the Federal Rules of Civil Procedure. <u>Fla.</u>

---

[5]  The parties subsequently extended the Temporary Restraining Order. <u>See</u> 479 F.Supp. at 1296.

Medical Ass'n., Inc. v. U.S. Dep't of Health, Education & Welfare, 601 F.2d 199, 202-203 (5th

Cir. 1979).[6]  Nevertheless, HHS agreed not to publish the contested data for a period of time.

Id. at 203, n.4.

On October 22, 1979, the late Senior District Judge Charles R. Scott granted Plaintiffs'

request for injunctive relief.  See generally 479 F.Supp. 1291 ("FMA Injunction Order").

Examining competing public and private interests, Judge Scott determined that the proposed

disclosure, "at least in the individually identifying manner," was covered by FOIA Exemption

6, and thus, the disclosure would violate the Privacy Act.  Id. at 1311.  That same day, the

Court issued a Final Declaratory Judgment and Permanent Injunction which:

> 1. . . . permanently enjoined [HHS] from disclosing any list of annual Medicare reimbursement amounts, for any years, which would personally and individually identify those providers of services under the Medicare program who are members of the recertified class in this case.
>
> 2.    Any such disclosure of annual Medicare reimbursement amounts, for any years, in a manner that would personally and individually identify the providers of services under the Medicare program who are members of the recertified class in this case is declared to be contrary to federal law.

Fla. Medical Ass'n., Inc. v. Dep't of Health, Education & Welfare, No. 78-178 (M.D. Fla. Oct.

22, 1979)(see Doc. 59 at 25-26)("1979 FMA Injunction").

---

[6]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

### B.   Post-Injunction Developments

#### 1.   1980: HHS Policy Modification

On November 28, 1980, HHS published in the Federal Register a modification of its policy on disclosure of amounts paid to individual physicians under the Medicare program following, and in light of, "federal court decisions."  45 Fed. R. 79172 (Nov. 28, 1980)("1980 HHS Notice").   Referring to the 1977 policy statement found at 42 Fed. Reg. 14703, ("preamble to the interim rules of the Social Security Administration for disclosure of information"), which stated that disclosure would not constitute an unwarranted invasion of the individual physician's privacy, the 1980 HHS Notice announced that two federal courts, "have concluded that the disclosures do constitute an unwarranted invasion of personal privacy of the individual physicians and the Secretary has been enjoined from disclosing the amounts of payment to individual physicians."  Id. (citing "Fla. Medical Ass'n., Inc. v. Dep't of Health Ed. and Welfare, M.D. Fla. 1980 [sic]" and "The Amer. Ass'n. of Councils of Med. Staffs of Private Hosp., Inc. v. Health Care Financing Admin., E.D. La. 1980)").  The 1980 HHS Notice stated that an appeal had not been taken from the courts' injunctions,[7] and that

> The Secretary has considered the competing interests and has concluded that the public interest in the individually identified payment amounts is not sufficient to compel disclosure in view of the privacy interests of the physicians found compelling by the courts.[8]

---

[7]  HHS  filed a notice of appeal as to the 1979 FMA Injunction Order and 1979 FMA Injunction, but later moved for voluntary dismissal of the appeal, and the clerk entered dismissal on June 11, 1980. (HHS Response at 8 (citing Fla. Med. Ass'n. v. Dep't of Health, Educ. & Welfare, No. 79-4087 (5th Cir. June 3 and 11, 1980)).

[8]  The 1980 HHS Notice contained the following caveat:

(continued...)

See 1980 HHS Notice.

## 2.   1982: Injunction Modification

On December 2, 1982, Judge Scott clarified the 1979 FMA Injunction, at the request of HHS, to ensure that the injunction would not prevent HHS from disclosing individual payment information, with respect to physicians suspected of unlawful acts, to federal, state or local law enforcement agencies.  Fla. Medical Ass'n. Inc. v. Dep't of Health, Education, and Welfare, No. 78-178-Civ-J-S (M.D. Fla. Dec. 2, 1982)(the "Modification Order").[9]  The Court observed that it had prohibited disclosure by HHS of "Medicare payment information about individually-named physicians," finding "that such disclosure was not required by the [FOIA], 5 U.S.C. § 552, pursuant to the exemption set forth in 5 U.S.C. § 552(b)(6), and in fact was prohibited by the Privacy Act, 5 U.S.C. § 552a."  Id.  In ruling on HHS's motion, Judge Scott explained that the permanent injunction

> was premised upon federal statutory grounds.  479 F.Supp. at
> 1311, n.10.  The sort of disclosure which the decision addressed
> was that which is prohibited by the Privacy Act without the prior
> written consent of the affected individual.  479 F.Supp. 1306-
> 1307.  Hence, the Court's injunction did not cover disclosure
> pursuant to the Law Enforcement Exception, or any other
> exception set forth in subsection (b) of the Privacy Act, since the
> statute, by its terms, does not prohibit such disclosure, even

---

[8](...continued)
> This determination does not affect the policy of the Department that
> amounts of payments made by the Department in other circumstances
> will be disclosed to the public.  For example, amounts of payments to
> consultants and contractors who contract directly with the Department
> for the provision of goods or services to the Department will continue
> to be available to the public.

45 Fed. Reg. 79172.

[9]   A copy of this modification was filed as an exhibit in the case Alley v. U.S. Dep't of Health & Human Serv., 1:07-cv-00096-KOB (N.D. Ala.)(Document 32-1 at 10).

> where no written consent is obtained.  On the other hand, any
> disclosure made without the prior consent or the affected
> individual, which does not fall within the specific exceptions set
> forth in subsection (b) is prohibited by the Privacy Act and by the
> Court's injunction.

Id. at 3.  Accordingly, as construed by the Court, the 1979 FMA Injunction would not to

prohibit disclosure by HHS of Medicare payment information to law enforcement agencies

"where such disclosure is authorized under 5 U.S.C. § 552a(b)(7)."  Id.  No appeal was taken.

### 3.    HHS' Disclosure of Information to Intervenor Alley 2002-2007

Intervenor Jennifer Alley ("Alley") is the owner of Intervenor Real Time Medical Data,

LLC (collectively "RTMD"), a "business that uses Medicare claims data to assist hospitals and

other clients with their marketing and strategic planning efforts." Alley, 590 F.3d at 1200; see

also (Doc. 55-1; Alley Decl. ¶¶ 2-6).  On June 20, 2001, RTMD submitted a formal FOIA

request to the HHS Center for Medicare Services ("CMS") seeking Medicare claims data,

including physicians' names and addresses, diagnosis codes, patient discharge status and

the type of bill submitted.  Alley Decl. ¶ 10.  CMS granted the request.  "In June 2003, RTMD

began submitting FOIA requests for Medicare inpatient data for the state of Alabama, which

were granted from 2003 to 2007."  Id. ¶ 12.  Also, during 2003, RTMD submitted a FOIA

request for Medicare data for the states of Tennessee, Georgia, Florida and Mississippi.  Id.

¶ 13.  CMS denied RTMD's multi-state FOIA requests, saying they would be too time-

consuming to fulfill.  Id. ¶ 14-15.  RTMD appealed that denial.  Id. ¶ 16.  During the

processing of the appeal, CMS continued to fulfill RTMD's FOIA requests for Alabama

Medicare data on a regular and timely basis.  Id.  ¶ 18.

Because of CMS' delay in resolving RTMD's appeal regarding the request for multi-state data, on January 11, 2007, RTMD filed a FOIA complaint in the United States District Court for the Northern District of Alabama seeking the requested information.  Id. ¶ 20; see also Alley, 590 F.3d at 1198.  In response, HHS contended that the data requested was exempt from disclosure under Exemption 6 of FOIA.  Alley Decl. ¶ 21.  The Alabama District Court concluded that this Court's 1979 FMA Injunction did not apply to the records sought by Alley and RTMD, and that "disclosure would not constitute a clearly unwarranted invasion of privacy under Exemption 6."  Thus, the Court ordered HHS to disclose the documents. Alley, 590 F.3d at 1201.

HHS appealed, and on December 18, 2009, the Eleventh Circuit reversed the trial court.  See generally Alley, 590 F.3d 1195.  Citing GTE Sylvania, Inc. v. Consumers Union of U.S., Inc., 445 U.S. 375, 387 (1980), the court explained "an agency does not improperly withhold information when a federal district court has enjoined the agency from disclosing the information."  Alley, 590 F.3d at 1203.  In accordance with the Supreme Court's GTE Sylvania decision, the court stated that "an injunction issued by one court against the disclosure of information may not be collaterally attacked in another court in a FOIA lawsuit seeking disclosure of that information."  Id. at 1203.  Instead, "the appropriate forum in which to challenge the validity of the order is the district court that issued it."  Id. at 1204 (citing Wagar v. U.S. Dep't of Justice, 846 F.2d 1040, 1047 (6th Cir. 1988)).  In accordance with these principles, the Eleventh Circuit provided the following procedural roadmap for this case:

> The rule that a FOIA lawsuit may not be used to collaterally attack an injunction prohibiting disclosure of certain records does not mean there is no remedy for the party seeking these records. It means that the party must first succeed in having the issuing

-10-

> court modify or vacate the injunction barring disclosure.  If that
> court refuses, the party may appeal that refusal.  A direct attack,
> instead of a collateral one, is the proper procedure.

Id.  The Eleventh Circuit further instructed that if Alley wished to raise issues regarding

whether the 1979 FMA Injunction should be vacated or modified, "she can do so before the

United States District Court for the Middle District of Florida in a proceeding to alter or vacate

the injunction; we will not decide those issues here."  Id. at 1209-10.  In so holding, the

Eleventh Circuit commented on the breadth of the 1979 Permanent Injunction, stating:

> [T]he FMA injunction simply is not limited to reimbursement
> amounts under the old payment system.   It plainly bars
> disclosure of "Medicare reimbursement amounts," without any
> qualification regarding the methodology used in setting those
> amounts.

Alley, 590 F.3d at 1209.

RTMD submitted another FOIA request for the Alabama Medicare data on April 13,

2007.  This request was denied and RTMD and Alley have not received any FOIA data since

that denial.  Alley Decl. ¶¶ 22, 23.  Nevertheless, Alley states:

> In that nearly six years, CMS provided RTMD with Medicare data
> for approximately 5 million claims.  To my knowledge, not one
> single physician ever objected to the disclosure of any
> information contained within that data.

Id. ¶ 24.

### 4.    Wall Street Journal Investigation 2009

Intervenor Dow Jones and Company, Inc. ("Dow Jones") is the publisher of The Wall

Street Journal, a nationally distributed newspaper.  In 2009, the Journal began working with

a nonprofit journalism organization, Center for Public Integrity ("CPI"), to investigate Medicare

data, known as the Limited Data Set Files ("LDS Files"), maintained by the CMS, an HHS

agency.  (Doc. 1-2; Allen Decl. ¶ 5).  The <u>Journal</u> sought access to the Carrier Standard Analytic File ("Carrier File"), a subset of the LDS Files.  According to Dow Jones, the Carrier File has "essentially limitless potential to help expose fraud, waste, and abuse in the Medicare system."  Allen Decl. ¶ 3.

In June 2009, CPI submitted a FOIA request to HHS, requesting portions of the LDS Files.  When HHS did not respond to the request, CPI filed a FOIA suit in the United States District Court for the District of Columbia.  Allen Decl. ¶¶ 5, 6; Tamman Decl. ¶¶ 5, 6.  However, the parties voluntarily dismissed the FOIA suit on January 27, 2010, after reaching a settlement.  Allen Decl. ¶ 6.  As part of the settlement, "Dow Jones and CPI were able to negotiate to purchase from HHS a portion of the Carrier File which contained all billings for a randomly selected 5% of Medicare recipients," and some other sample files, pursuant to a standardized Data Use Agreement ("Agreement") with CMS, signed by Dow Jones and CPI.  The Agreement provided that "Dow Jones would not disseminate information derived from the LDS Files if the information could be reasonably used to deduce an individual doctor's identity."  Allen Decl. ¶¶ 6, 7; Tamman Decl. ¶¶ 8, 9; <u>see</u> (Doc. 1-3 at 24; Agreement).  The Agreement further provided that Dow Jones could "challenge, at any time in the future, the legal basis for denying public access to, or prohibiting dissemination of, information derived from the files [specified] . . . or any other information."  Agreement, Attachment A, ¶ A-4; <u>see also</u> Allen Decl. ¶ 7; Tamman Decl. ¶ 18.  Based upon the information it was able to obtain, the <u>Wall Street Journal</u> published a series of articles about Medicare between April and December, 2010, and February and April, 2011, touching upon possible fraud, waste, and abuse by Medicare providers.  Allen Decl. ¶¶ 8-10; Tamman Decl.

¶¶ 10, 11; (Doc. 1-3; Schoofs Decl. ¶¶ 2-6); (Doc. 19; Dow Jones Supplemental Exhibits). Dow Jones contends that the 1979 FMA Injunction caused HHS to limit access to data from the LDS Files, which interfered with, and continues to interfere with the <u>Journal's</u> reporting on Medicare.  Allen Decl. ¶¶ 15-18, 21, 22, 25; <u>see also</u> Tamman Decl. ¶¶ 6, 12-16; Schoofs Decl. ¶¶ 7–28.

### C.    The Current Posture

On January 25, 2011, Dow Jones filed a Motion to Intervene in this case, pursuant to Rule 24, in order for it to seek to vacate the 1979 FMA Injunction.  (Doc. 1; Dow Jones Motion to Intervene at 1).  RTMD filed a similar Motion to Intervene on April 18, 2011.  (Doc. 20; RTMD Motion to Intervene).  The Court granted Dow Jones' and RTMD's Motions to Intervene,[10] allowing them to each file a motion, pursuant to Rule 60, to modify or vacate the 1979 FMA Injunction.[11]  The pending motions to vacate followed.

## II.    The Parties' Arguments

In the RTMD Motion, RTMD argues that the 1979 FMA Injunction should be vacated pursuant to Rule 60, because the balance between the physicians' privacy interests in maintaining Medicare reimbursements confidential and the public interest in disclosure of Medicare reimbursement amounts has changed greatly since 1979, making continued enforcement of the 1979 FMA Injunction a "manifest injustice."[12]  RTMD Motion at 15.

---

[10]  The Court will not repeat its analysis which is set forth in full in the Intervention Order.

[11]  Both intervenors also sought to be able to bring new claims in this action.  The Court denied those requests.  <u>See</u> Intervention Order at 32-35.

[12]  Specifically, RTMD argues that significant changes in the Medicare reimbursement system have eliminated physician privacy rights with respect to the providers' actual rates of pay.  <u>Id.</u> at 8; <u>see</u>
(continued...)

Additionally, RTMD contends that the physicians' privacy interest in reimbursement amounts has been further reduced by the "Qualified Entity Program" created by the Patient Protection and Affordable Care Act of 2009, as amended by the Health Care and Education Reconciliation Act of 2010, because CMS will disclose identifying Medicare Part B data to qualified entities to create provider performance reports and will publish those reports even if the providers suggest that the Medicare data is erroneous.  RTMD Response at 9-10; RTMD Reply at 9.  RTMD also notes that HHS's disclosure of Medicare data to RTMD from 2003 through 2007 resulted in no complaints by physicians.  RTMD Response at 13.  Thus, RTMD urges the Court to re-calibrate what it argues is a reduced privacy interest in light of "[t]oday's urgent public interest in disclosure," based upon  the ballooning cost of Medicare ("$510 billion in 2010, with an anticipated 5.6% annual increase in costs over the next decade"); the possibility that disclosure will help expose fraud and abuse ("between 3% and 10% of total health care expenditures are lost to fraud on an annual basis"); and the need for "healthcare strategic planning."  Id. at 15-16.

Dow Jones takes a similar approach in the Dow Jones Motion.  It argues that the 1979 FMA Injunction should be vacated, pursuant to Rule 60, because "the factual and legal landscape" have changed dramatically since 1979. Dow Jones Motion at 5.  As to the factual changes, Dow Jones first argues that providers no longer set their own "reasonable fees."

---

[12](...continued)
also RTMD Reply at 5-6.  RTMD explains that in 1979, at the time of Judge Scott's decision, Medicare providers were paid under a "reasonable fee" reimbursement system that gave providers wide discretion to determine their own fees. Id. at 2 (citing 42 U.S.C. § 1395u(b)(3)(1976)).  Subsequently, the Deficit Reduction Act of 1984 "froze 'prevailing rate' and 'customary' fees payable to participating physician[s], until a new reimbursement system could be created," id. at 3 (citing 42 U.S.C. § 1395u(b) et seq.(1984), and the "subsequent Omnibus Reconciliation Act of 1989 . . . authorized the creation of a fee schedule for physician services that would apply to providers across-the-board, and would be published as a public record. Id. (citing Public Law 101-239).

Id. at 6. Second, the 1979 FMA Injunction has been construed to reach all physician providers, whether corporate or individual, well beyond the membership of the FMA and AMA. Id. at 7 (citing Alley v. HHS, No. CV-07-BE-0096-E (N.D. Ala. March 30, 2011)(Doc. 139 at 9)). Next, Dow Jones focuses upon the public interest in disclosure of the Medicare data, noting that since 1979, Medicare "has grown twenty-fold in nominal dollars, and nearly three-fold as a percentage of the total federal budget." Id. at 9 (emphasis omitted)(citing Doc. 56-1; Sparrow Decl. ¶ 20)). Additionally, Dow Jones emphasizes the prevalence of Medicare fraud, citing both published statistics and specific examples. Id. at 10-11 (citations omitted). Pointing to expert testimony, its own news stories which were based on the limited data made available by its Data Use Agreement with CMS, a United States Department of Justice investigation, and other media investigations uncovering Medicare fraud, Dow Jones contends that the reimbursement data can be used to uncover Medicare fraud. Id. at 11-15.[13] Moreover, Dow Jones argues that any privacy interest providers claim in the Medicare

---

[13] Dow Jones lists the changes in fact as follows: "fundamental changes in the methodology for determining reimbursement amounts paid to physicians, the means of reimbursing physicians, and the degree of public disclosure of physician-identifying and other taxpayer subsidized information now mandated by law." Dow Jones Reply at 2. Additionally, Dow Jones argues that "the size of Medicare and, with it, the fraud and abuse, have grown exponentially, government's ability to police the program is concomitantly outmatched, and Medicare electronic data is an invaluable tool to both detect fraud and monitor the government's efforts in that regard." Id. Dow Jones contends that even with limited information, the Wall Street Journal was able to expose "substantial evidence of fraud." Id. at 2-3.

Dow Jones further contends that "[t]he current data is wholly different in scale, in form and substance." Id. at 5.

> The records now are many terabytes of electronic data, containing payment information calculated based on published rates for billings submitted and paid electronically, offering a degree of accuracy and granularity wholly absent from the 1977 tally of annual reimbursements that were the subject of the 1979 Injunction.

Id.

reimbursement data is belied by the fact that similar data is routinely made available to the public.[14] Id. at 15-16; see also Dow Jones Reply at 11-12.  As such, according to Dow Jones, "[t]hese changes have . . . fundamentally altered the calculus so that the privacy interests of physicians no longer clearly outweigh the compelling public interest in monitoring a program that now consumes one out of every eight federal dollars."  Dow Jones Reply at 3. Additionally, citing News-Press v. U.S. Dep't. of Homeland Sec., 489 F.3d 1173 (11th Cir. 2007), Dow Jones argues that the law has changed, and that now, the Eleventh Circuit "'disfavors privacy claims by those who receive a governmental benefit,'" and that Exemption 6 to FOIA was meant to protect "intimate details," and not federal payments.  Dow Jones Motion at 20-21; see also Dow Jones Reply at 7, 9-10.

Plaintiffs AMA and FMA oppose the motions to vacate the 1979 FMA Injunction, arguing that neither the facts nor law have changed since 1979, inasmuch as the Privacy Act and FOIA Exemption 6 remain the same; the revenues that individual physicians receive for their services to Medicare patients continue to be private information; and the public interest in preventing Medicare fraud has not changed since 1979.  AMA and FMA Response at 1-2. Thus, according to Plaintiffs, the Intervenors have not made a "clear showing of grievous wrong" justifying vacatur of the 1979 FMA Injunction pursuant to Rule 60.  See id. at 7, 31 (citing United States v. Swift, 286 U.S. 106, 119 (1932)).  Plaintiffs further contend that there has been no "significant" modification of the law, citing to the recent decision of Consumers'

---

[14]    For example, Dow Jones notes that the salaries of nearly all federal employees, including physicians, is available in the public record; payments to contractors, attorneys hired pursuant to the Criminal Justice Act, and the Medicare reimbursement fee schedule are all a matter of public record; individualized provider information is released to Qualified Entities under the ACA;  and the names of recipients of federal funds pursuant to the American Recovery and Reinvestment Act of 2009 are available.  Dow Jones Motion at 15-16; see also Dow Jones Reply at 11-12.

Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health and Human Servs., 554 F.3d 1046 (D.C. Cir. 2009).[15] Id. at 9-11.  Likewise, Plaintiffs argue that there has been no change in facts which diminishes the physicians' privacy interest in their personal financial information.  Id. at 17.  As to the public interest, Plaintiffs argue that the Intervenors have not established how the release of the data would uncover massive fraud, not already being investigated by law enforcement authorities.  Id. at 28-31.

HHS's position is driven by the procedural posture of this case, and what it argues is a subsequent significant change in the law which HHS contends makes prospective enforcement of the 1979 FMA Injunction no longer equitable.  HHS argues that the Court in 1979 exceeded the limits of the remedies which are now recognized to be authorized by the Privacy Act and the Administrative Procedures Act ("APA") by issuing a broad permanent injunction "barring potentially similar disclosures in the future."   HHS Response at 1. Specifically, HHS argues that the Court entered the 1979 FMA Injunction based upon its belief that the Privacy Act "authorized Courts to issue broad injunctions" to prevent disclosure of information that is subject to the Privacy Act.  Id. at 2.  However three years after the entry of the Injunction, the Eleventh Circuit Court of Appeals decided Edison v. Dep't of Army, 672 F.2d 840 (11th Cir. 1982), in which it held that the Privacy Act does not authorize injunctive relief against a government agency to prevent it from disclosing information.  Id.  This, says HHS, constitutes a significant change in the law warranting vacatur of the 1979 FMA

---

[15]   Plaintiffs argue that in Consumers' Checkbook, a FOIA case, the court  held that provider reimbursement information was not subject to mandatory disclosure pursuant to FOIA because, under Exemption 6, physicians had a substantial privacy interest in total payments they received from Medicare for covered services, and disclosure of Medicare claim information for specified locations would not serve the public interest.  See AMA and FMA Response at 9-11.

Injunction, pursuant to Rule 60.  HHS Response at 1.  HHS also argues that the APA could not have empowered the Court "to issue a permanent injunction reaching potential future disclosures that were not yet contemplated at the time of the Court's decision," but rather was available only for judicial review of HHS's decision to disclose the 1977 data. Id. at 2.  Thus, HHS concludes that "as a consequence of the Eleventh Circuit's ruling in Edison, there is no longer any statutory basis for the 1979 permanent injunction." Id. at 16 ("Edison therefore amounts to a significant change in law that makes continued enforcement of the 1979 injunction improper.").

Regardless of the Court's decision on the pending motions, however, HHS notes that invalidation of the 1979 FMA Injunction will not result in immediate release of provider reimbursement data.  Instead, a person or entity seeking the data would have to submit a FOIA request, and "[f]or years, it has been the position of HHS that the Privacy Act and a complementary provision of [FOIA], 5 U.S.C. § 552(b)(6), do not permit the release of the data at issue here." Id. at 2-3 (citing HHS' position in the case Consumers' Checkbook, 554 F.3d at 1056).[16]

In their Reply Briefs, Intervenors Dow Jones and RTMD agree that the Eleventh Circuit, in Edison, eliminated the statutory basis for the 1979 FMA Injunction.  Further, they argue that the broad injunctive relief granted is not authorized by the Privacy Act, FOIA, or the APA.  Dow Jones Reply at 3-5; Dow Jones Supplement at 1-3; RTMD Reply at 1, n.1.

---

[16]   HHS argues that any future agency decisions regarding whether or not to release the Medicare reimbursement information should be "reviewed on the facts and the law as they are at the time of the decision, not as they were more than three decades ago." Id. at 2-3.

Thus, they contend, continued enforcement of the 1979 FMA Injunction is no longer supported by law.

Plaintiffs, however, disagree.  They argue that in entering the 1979 FMA Injunction, the Court was reviewing agency action pursuant to the APA, and that because the Court determined that the disclosure was contrary to law under FOIA and the Privacy Act, the Court had the authority, under the APA, "to enjoin such unlawful disclosure."  AMA and FMA Reply at 3, 4; see also Tr. at 8-14.  As such, according to Plaintiffs, the Edison case, which holds that the Privacy Act, standing alone, does not provide a private right of action to enjoin agency disclosure, does not constitute a "significant change in the law" for Rule 60 purposes, because "the APA does provide such a right of action." Id. at 4.  Plaintiffs argue that the breadth of the HHS forward-looking 1977 rule authorizing release of Medicare provider financial information underscores that HHS's disclosure was "continuing," and thus, a forward-reaching injunction was, and still is, appropriate.  AMA and FMA Reply at 4.  Even if applicable, Plaintiffs contend that Edison does not represent a change in the law because an earlier case, Cell Associates, Inc. v. Nat'l Institutes of Health, 579 F.2d 1155 (9th Cir. 1978), cited by Judge Scott in the FMA Injunction Order, 479 F.Supp. at 1305-06, had previously held that the Privacy Act did not provide for injunctive relief.  AMA and FMA Reply at 10.  To this end, Plaintiffs argue that "'Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests.'"  Id. at 4 (quoting Horne v. Flores, 557 U.S. 433, 447 (2009)).

### III.    Standard of Review: Rule 60

Rule 60(b) provides a district court the discretion to utilize equitable power to relieve a burden or imposition placed upon a party by injunction or declaratory judgment, and to prevent an "'inequitable operation of a judgment.'" Cano v. Baker, 435 F.3d 1337, 1339-40 (11th Cir. 2006)(citation omitted).  "A motion for Relief under Rule 60(b) must be shaped to the specific grounds for modification or reversal enumerated in the Rule, and it may not be a mere general plea for relief." Wendy's Int'l, Inc. v. Nu-Cape Constr., Inc., 169 F.R.D. 680, 686-87 (M.D. Fla. 1996).

Specific to the instant action, Rule 60(b)(5)[17] allows a district court to vacate or modify a permanent injunction when "'it is no longer equitable that the judgment should have prospective application . . . .'" Reynolds v. McInnes, 338 F.3d 1221, 1226 (11th Cir. 2003)(citation omitted).  While "Rule 60(b)(5) may not be used to challenge the legal

---

[17]   The parties' arguments focus solely upon the applicability of Rule 60(b)(5) and (6).

Subsections (5) and (6) of Rule 60(b)provide:

> **(b)    Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (5)    the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6)    any other reason that justifies relief.

Although the parties alternatively rely upon subsections (b)(5) and (b)(6), relief under subsection (6) is available only if relief is not available under subsections (1) through (5) of Rule 60(b).  BUC Int.'l Corp. v. Int'l Yacht Council Ltd., 517 F.3d 1271, 1275 n.4 (11th Cir. 2008).  As there is no dispute that subsections (1) through (4) are not applicable here, the Court begins its analysis with consideration of whether vacatur or modification of the 1979 FMA Injunction is warranted under Rule 60(b)(5).

conclusions on which a prior judgment or order rests, . . . the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"   Horne v. Flores, 557 U.S. 433, 447, 129 S.Ct. 2579 (2009)(quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992)).[18]

In Rufo, the Supreme Court set forth a two-step analysis for determining whether modification of existing injunctive relief is warranted. First, the "party seeking the modification of [an injunction][19] bears the burden of establishing that a significant change in circumstances warrants revision of the decree."   Rufo, 502 U.S. at 383.   The moving party may satisfy this burden by showing "a significant change either in factual conditions or in law."   Id. at 384. In this regard, "the question is whether any change in factual or legal circumstances renders

---

[18] Although initially arguing that only satisfaction of the more stringent "grievous wrong" standard set forth in United States v. Swift & Co., 286 U.S. 106, 119 (1932) could warrant relief from a permanent injunction, see AMA and FMA Response at 7,the AMA and FMA, at oral argument, appeared to agree that the more flexible "changed circumstances" standard used in Horne and Rufo applies beyond institutional reform cases to cases such as this, see Tr. at 19-22; see also Rufo, 502 U.S. at 380; see also In re Consol. 'Non-Filing Insurance' Fee Litig., 431 F. App'x 835, 839-41 (11th Cir. 2011)(applying the Rufo analysis to a Rule 60(b) motion to modify a "non-institutional" consent decree); Johnson v. Florida, 348 F.3d 1334, 1342-44 (11th Cir. 2003)(Rufo court holds that "significant change in circumstances" may warrant modification of a decree, rather than the Swift "grievous wrong" standard); United States v. City of Miami, 2 F.3d 1497, 1505 (11th Cir. 1993)("we find that the principles articulated in Rufo and Dowell [498 U.S. 237, 111 S.Ct. 630 (1991)] are applicable to requests to modify or terminate decrees in employment discrimination cases, like the one before us.")(emphasis in original); Bellevue Manor Assocs. v. United States, 165 F.3d 1249, 1255-57 & n.5 (9th Cir. 1999)(citing cases); Bldg. and Constr. Trades Council v. NLRB, 64 F.3d 880, 887 (3d Cir. 1995)("Rufo . . . represents an interpretation of the generally applicable Rule 60(b)(5) and a discussion of the equitable considerations that courts must take into account in ruling on requests to modify injunctions").  Indeed, in setting forth the procedural roadmap for this case to follow and stating, "[a] direct attack [filing a Rule 60(b) motion in this Court], instead of a collateral one, is the proper procedure," the Eleventh Circuit cited cases discussing the "changed circumstances" analysis.  See Alley, 590 F.3d at 1204 (citing Horne, 129 S.Ct. at 2593; Doe 1-13, ex rel. Doe Sr. 1-13 v. Bush, 261 F.3d 1037, 1063-64 (11th Cir. 2001)).

[19]   While Rufo was discussing a Rule 60(b)(5) modification of a consent judgment, "[f]or purposes of modification, consent decrees . . . are treated as judicial acts, akin to injunctions." Jacksonville Branch, NAACP v. Duval County Sch. Bd., 978 F.2d 1574, 1578 (11th Cir. 1992).

continued enforcement of the original order inequitable." Horne, 557 U.S. at 457.  Second, if the moving party satisfies this initial burden, it must show that "the proposed modification is suitably tailored to the changed circumstance."  Rufo, 502 U.S. at 391, 393; see also Ensley Branch, N.A.A.C.P. v. Seibels, 31 F.3d 1548, 1563-64 (11th Cir. 1994).  The Eleventh Circuit has summarized the Rufo factors for modification as follows:

> Modification may be considered when (1) a significant change in facts or law warrants change and the proposed modification is suitably tailored to the change, (2) significant time has passed and the objectives of the original agreement have not been met, (3) continuance is no longer warranted, or (4) a continuation would be inequitable and each side has legitimate interests to be considered.

Jacksonville Branch, NAACP v. Duval County Sch. Bd., 978 F.2d 1574, 1582 (11th Cir. 1992)(citing Rufo, 502 U.S. at 391-92); see also In re Consol. 'Non-Filing Insurance' Fee Litig., 431 F. App'x 835, 840-41 (11th Cir. 2011).[20]

Under Rule 60(b)(5), a court "applies a flexible standard to determine whether changed circumstances dictate that [an injunction] should be modified." In re Consol. Litig., 431 F. App'x at 840 (citing Rufo, 502 U.S. at 380).  However, relief under the Rule is not available where continued enforcement "is no longer convenient," nor may the Rule "be used to challenge the legal conclusions on which a prior judgment or order rests." Horne, 557 U.S. at 447.  Nevertheless, a flexible standard of review is necessary because prospective injunctions, such as the one at issue here, "often remain in place for extended periods of time

---

[20]  "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[and] the likelihood of significant changes occurring during the life of the decree is increased."

Rufo, 502 U.S. at 380.

## IV.    **Discussion**

When Alley and RTMD intervened in this action for the purpose of vacating the permanent injunction, they did so based predominantly on their contention that the factual circumstances existing at the time the 1979 FMA Injunction was entered have changed so dramatically that its continued enforcement would constitute a manifest injustice.  HHS responded to their motions, agreeing that the 1979 FMA Injunction should be vacated. However, HHS argued that the legal (rather than the factual) landscape has changed in that the legal basis upon which the Court relied in granting the injunction, the Privacy Act, no longer exists, and Intervenors have now embraced that position as well.  Not surprisingly, Plaintiffs, well satisfied with the status quo, argue that neither the factual circumstances nor the legal circumstances have changed, and that the injunctive relief was, and remains, permissible under the APA.

The Court will first consider whether a change in the law has occurred that renders continued enforcement of the 1979 FMA Injunction inequitable.   Given the parties' contentions, critical to this inquiry is a determination of the true legal basis supporting the 1979 FMA Injunction.  Thus, the Court must resolve the parties competing interpretations of the legal basis underpinning the 1979 FMA Injunction.  This requires a detailed review of the FMA Injunction Order

## A.     The FMA Injunction Order

In the FMA Injunction Order, Judge Scott framed the case before him as presenting

the question of whether the Secretary of HHS "may disclose information concerning the

annual amounts of reimbursements paid to Medicare providers in a way that would

individually identify at least some of the providers." FMA, 479 F.Supp. at 1294.  Discussing

the factual background, the Court recounted HHS's 1977 publication of "a list containing the

names of physicians or groups of physicians whose services rendered during 1975 totaled

$100,000.00," and that the information was "widely publicized." Id. at 1297.  The Court noted

that

> [a]lso in March, 1977, the Secretary published in the Federal
> Register (42 Fed. Reg. 14703) an interim amendment to the
> rules for disclosure of Social Security records, contained in 20
> C.F.R. § 401.1 Et seq., in order to conform the current
> regulations to the most recent requirements of the [FOIA].  The
> effect of the amendment to 20 C.F.R. § 401.1 Et seq. was to
> adopt the principles of the [FOIA] as guiding rules for the
> disclosure of information by HEW.  42 Fed. Reg. at 14704.  See
> 20 C.F.R. s 401.3(a).

Id.[21] Consistent with this amendment "[i]n November 1977, the Secretary directed the various carriers, with whom HHS had contracted to prepare and publish by April 30, 1978, a list of all physicians and providers for whose services Medicare reimbursements had been paid in 1977." Id. By filing the action, Plaintiffs asked the Court to "enjoin the Secretary's disclosure of this information, and to declare that the proposed disclosure is unlawful." Id. (emphasis added).

Judge Scott began his analysis by confirming the federal court's subject matter jurisdiction over the claims.  In doing so, he first rejected the suggestion that the Medicare Act proscribed the Court's jurisdiction to review the challenged actions.  Id. at 1298.  Judge Scott explained that Plaintiffs contested the proposed disclosure based upon independent federal statutes ("the Privacy Act, the FOIA, the Trade Secrets Act, and the Social Security Act"), as well as on constitutional grounds.  Id.  As such, he concluded "for controversies (1)

---

[21]    Addressing procedures for "Disclosure of Official Records and Information," in order to conform with FOIA, the Secretary of HHS, on March 11, 1977, issued an "interim amendment" to rules for disclosure of social security records.  42 Fed. Reg. 14703-04 (March 16, 1977).  Examining the application of FOIA Exemption 6, 5 U.S.C. § 552(b)(6), which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," the Secretary stated:

> The balancing test may have a different impact on some other information currently protected by Regulation No. 1, for example, payments to individual physicians under the Medicare program. Although this information reflects at least to some degree the physician's income, a matter in which he has a privacy interest, disclosure would serve the strong public interest in the accountability of government programs, revealing how public funds are spent and the extent to which the funds are paid to individuals when acting in a business or professional capacity.  The Department's past disclosure of the amounts paid to physicians under the Medicaid program would be consistent with a determination that releasing the same information regarding Medicare payments does not involve a "clearly unwarranted" invasion of privacy.

42 Fed. Reg. 14703-04.

-25-

premised upon statutory and constitutional provisions other than the Medicare Act, and (2) concerning agency and officer conduct based upon statutes other than the Medicare Act, the Court has original subject matter jurisdiction under 28 U.S.C. § 1331(a)." Id. at 1298-99. Judge Scott further noted that pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, the Court had jurisdiction to review "Plaintiffs' claim that the Secretary's decision, and proposed conduct, do not measure up to the appropriate standard for agency action." Id. (citing Chrysler Corp. v. Brown, 441 U.S. 281, 315 and n.47 (1979)).

With respect to the Privacy Act, Judge Scott determined that "by asserting that the Secretary's decision and proposed conduct violates the conditions for disclosure provided by the Privacy Act, plaintiffs invoke the Court's jurisdiction conferred under 5 U.S.C. § 552a(g)(1)(D) of the Privacy Act to consider alleged violations of it." 479 F.Supp. at 1299.[22] He explained that section 552a(g)(1)(D) "is a general grant of a right of action to individuals covered by the [Privacy] Act," in contrast to 5 U.S.C, § 552a(g)(4)(A), which "is an express waiver of sovereign immunity by Congress, creating a right to obtain a damage remedy from the United States when one of its agencies intentionally or wilfully acts in violation of the

---

[22]   Section 552a(g)(1)(D) of the Privacy Act provides that an individual may bring a civil action against an agency in the district court when the agency

> (D)   fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual.

5 U.S.C. § 552a(g)(1)(D).

Privacy Act. . . ."[23]  Id. at 1299 n.8.  Additionally, in discussing the extent of the Court's jurisdiction under the Privacy Act, Judge Scott stated

> The general grant of a right of action, and of corresponding jurisdiction in the district courts, under § 552a(g)(1)(D) confers the subject matter jurisdiction upon the Court to issue injunctive and declaratory relief.

Id.

Firm in the conclusion that the Court had subject matter jurisdiction over Plaintiffs' claims, Judge Scott turned to the merits of the case.  Judge Scott analyzed Plaintiffs' various statutory claims, determining first that the Trade Secrets Act, 18 U.S.C. § 1905, did not afford an implied private civil right of action to enjoin disclosures which might violate the statute. Id. at 1299-1300.  Next, he found that the Social Security Act, 42 U.S.C. § 1306 authorized the Secretary to promulgate implementing regulation 20 C.F.R. § 401.1 et seq., which would permit disclosure of the Medicare reimbursement information at issue.  Thus, he concluded

---

[23]   Sections 552a(g)(4)(A) and (B) of the Privacy Act provide that in any suit brought under Sections 552a(g)(1)(C) or (D), in which the court determines that an agency acted willfully or intentionally, "the United States shall be liable to the individual in an amount equal to the sum of

> (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and
>
> (B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4)(A) and (B).

    As of September 2005, it does not appear that the Fifth Circuit Court of Appeals had not considered the availability of equitable relief under the Privacy Act.  See Koenig v. Dep't of the Navy, No. Civ. A. C-05-35, 2005 WL 2347302, at *1 (S.D. Tex. Sept. 26, 2005).

that "that statute [the Social Security Act] would not prohibit, but would permit" the disputed

disclosure.  Id. at 1300-1301.

In the next section of the opinion, titled "C. FOIA & Mandatory Disclosure," 479

F.Supp. at 1301, Judge Scott addressed the applicability of FOIA, observing that "FOIA is

exclusively a statute of sweeping, mandatory disclosure . . . ."  Id. (citing Chrysler Corp., 441

U.S. at 290).  Indeed, the Court explained that "unless the disclosure of [the] information falls

within the scope of one of the FOIA's exemptions, it may not be prohibited."  Id.  However,

as to the Plaintiffs' ability to rely on FOIA as a basis to enjoin disclosure, Judge Scott stated:

> [E]ven if the information which the Secretary proposes to
> disclose should fall within one of the exemptions to the FOIA's
> obligatory disclosure provisions, those exemptions do not provide
> a legal basis for enjoining disclosure.  In other words, the
> disclosure provisions of the FOIA are mandatory; but the
> exemptions from mandatory disclosure, in themselves, are
> discretionary.  In short, the FOIA exemptions do not forbid the
> disclosure of information, and therefore do not authorize an
> inverse-FOIA action for injunctive relief.

Id. (citing Chrysler Corp., 441 U.S. at 285 and Westchester Gen. Hosp., Inc. v. HEW, 464

F.Supp. 236, 238-39 (M.D. Fla. 1979)(Scott, J.)).  As such, the Court determined that FOIA

did not provide a basis to enjoin the proposed disclosure.

Judge Scott then proceeded to determine whether the information at issue fell within

a FOIA exemption such that its disclosure could lawfully be prohibited.  In sections titled "D.

FOIA & Exemption 3" and "E.  FOIA & Exemption 4," the Court concluded that neither FOIA

Exemption 3 nor Exemption 4 protected the information that was the subject of Plaintiffs'

action.  See 479 F.Supp. at 1302-1303.  Next, Judge Scott turned to "FOIA & Exemption 6."

He explained that this exemption "relieves from the mandatory disclosure of the FOIA

'personnel and medical files and similar files' when such disclosure 'would constitute a clearly unwarranted invasion of personal privacy.'" Id.; see also 5 U.S.C. § 552(b)(6).  Judge Scott first determined that the "similar files" provision of Exemption 6 should be given "broad interpretative scope," and thus, concluded that "the list of annual reimbursements to Medicare providers which the [HHS] Secretary proposes to disclose is information included within the term 'similar files' of Exemption 6."  479 F.Supp. at 1303-1304.  Next, the Court balanced the "competing public and private interests at stake," id. at 1304, and found that "the Secretary's proposed disclosure, at least in the individually identifying manner that she intends, is included within Exemption 6 of the FOIA, because it amounts to 'similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy,'" id. at 1305 (quoting 5 U.S.C. § 552(b)(6)).

Having found that the information at issue fell within a FOIA exception, the Court turned its analysis from FOIA to the Privacy Act.  See 479 F.Supp. at 1305 ("G.  Exemption 6 & the Privacy Act").  Judge Scott first explained that once it has been determined that information is exempt from disclosure under FOIA Exemption 6 because its disclosure would "'constitute a clearly unwarranted invasion of personal privacy' the relationship of Exemption 6 to the Privacy Act becomes significant."  Id.  "[I]nformation exempted under Exemption 6, from the mandatory disclosure provisions of the FOIA, becomes protected from disclosure by the Privacy Act."  Id. at 1305.  The Court determined:

> Thus, since the Privacy Act expressly defers to the mandatory disclosure provisions of the FOIA, 5 U.S.C. § 552a(b)(2), information which is not exempt under Exemption 6 from disclosure would receive no Privacy Act protection.  But if the release of information would "constitute a clearly unwarranted invasion of personal privacy," entitling that information to the

benefit of Exemption 6, then that same standard would apply to the Privacy Act's bar against disclosure without "the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b) [additional citations omitted.] It is not that the Privacy Act was intended to establish any absolute right of privacy, . . . ; but for those personal privacy rights which would be invaded in a clearly unwarranted manner by the disclosure of individually identifying information, not only does Exemption 6 of the FOIA relieve that information from obligatory disclosure, but the Privacy Act forbids its disclosure without the affected individual's "prior written consent."

479 F.Supp. at 1306.  As such, Judge Scott stated,

Having concluded that the [HHS] Secretary's proposed disclosure, in an individually identifying manner, of the annual amounts of reimbursements to providers of services under the Medicare Act, would "constitute a clearly unwarranted invasion of personal privacy," and is therefore included within Exemption 6 of the FOIA, the Court further holds that the release of such individually identifying information, without the "prior written consent" of those individually identified providers, is prohibited by the Privacy Act.

Id. at 1306-1307.

Finding that the Privacy Act prohibited the release of individually identifiable Medicare provider reimbursements, Judge Scott considered HHS's challenge to Plaintiffs' standing to invoke the protection of, and obtain relief under, the Privacy Act.  Id. at 1307-10 ("H. Plaintiff's Standing as Individuals Under the Privacy Act").  In support of the contention that Plaintiffs had no such standing, HHS pointed to an Office of Management and Budget ("OMB") regulation and its own corresponding HHS regulation (45 C.F.R. § 5b.1(e)).  Id. at 1307-08.[24]  However, the Court concluded that "[a]n individual has Privacy Act rights in all his

---

[24]  The HHS regulation restricted the definition of the word "individual" as follows: "It does not include persons such as sole proprietorships, partnerships, or corporations.  A business firm which is identified by the name of one or more persons is not an individual within the meaning of this part (of the

(continued...)

or her capacities, including business relationships and activities," id. at 1309, and thus,

Plaintiffs had standing under the Privacy Act as "individuals concerned about disclosure of

their 'personalized' financial information." Id. at 1310.  In so doing, the Court held:

> There can no longer be any doubt that the Secretary's proposed disclosure of annual Medicare reimbursements amounts, in a way that will identify individual Medicare providers and their amounts of reimbursements, runs afoul of, and therefore is prohibited by, the Privacy Act.

Id. at 1311.  As such, the Court held that HHS's regulation, 45 C.F.R. § 5b.1(e), and the

corresponding OMB guideline, which would restrict Privacy Act protection to "individuals," and

exclude sole proprietorships, partnerships, or corporations, see id. at 1307-1311, "are

inconsistent with the [Privacy Act] statute that they purport to implement; and to that extent

they are null and void." Id. at 1311.  With that, Judge Scott concluded the opinion stating:

> In conclusion, the Court holds that the Secretary's proposed disclosure of a list of annual reimbursements to individually identified providers of services under the Medicare Act (1) is exempt from required disclosure under the FOIA because it would "constitute a clearly unwarranted invasion of personal privacy"; (2) is prohibited by the Privacy Act from disclosure, without the prior written consent of each affected individual; and (3) if the guidelines and regulations of OMB and HEW would otherwise authorize and allow such disclosure, they are contrary to the Privacy Act and without force and effect.  A permanent injunction on behalf of plaintiffs and the recertified class that they represent will be issued.

Id. at 1311 (internal footnote omitted).[25]

---

[24](...continued)
HHS Privacy Act Regulations)." Id. at 1308 (citing 45 C.F.R. § 5b.1(e)).

[25]  Because Judge Scott's decision was premised upon federal statutory grounds, the Court did not reach Plaintiffs' constitutional claims.  479 F.Supp. at 1311 n.10.

That same day, and for the reasons set forth in the Court's opinion, Judge Scott issued the 1979 FMA Injunction.

### B.    The Legal Basis of the 1979 FMA Injunction

Although in the FMA Injunction Order, Judge Scott determined that the Court had subject matter jurisdiction over Plaintiffs' lawsuit pursuant to the Privacy Act, FOIA, the Trade Secrets Act, the Social Security Act, and the Administrative Procedures Act (APA), review of the Court's reasoning in granting relief confirms that entry of the 1979 FMA Injunction was grounded in Judge Scott's application of the Privacy Act.  Indeed, nothing about the FMA Injunction Order suggests otherwise.

After determining that Plaintiffs were unable to obtain relief pursuant to the Trade Secrets Act, and the Social Security Act, Judge Scott addressed FOIA. 479 F.Supp. at 1299-1301.   He readily concluded that FOIA exemptions "do not forbid the disclosure of information, and therefore do not authorize an inverse FOIA action for injunctive relief." Id. Nevertheless, Judge Scott also recognized that "unless the disclosure of [the] information falls within the scope of one of the FOIA's exemptions, it may not be prohibited.  Id. (emphasis added).  Thus, despite finding that FOIA itself would not provide a basis for the relief sought by Plaintiffs, the Court had to consider whether the information at issue fell within the scope of a FOIA exemption.

After careful consideration, Judge Scott determined that the proposed disclosure fell within Exemption 6, as constituting a "'clearly unwarranted invasion of personal privacy.'" He then turned to the Privacy Act and concluded that "[i]nformation exempted under Exemption 6, from the mandatory disclosures provisions of the FOIA, becomes protected from disclosure

by the Privacy Act." Id. at 1305; see also id. at 1306 (same conclusion, after analyzing legislative history of the Privacy Act).  As such, the Court held that release of Medicare reimbursement information in an individually identifying manner without prior consent of the providers "is prohibited by the Privacy Act." Id. at 1306-07.  Then, in response to HHS's contention that Plaintiffs lacked standing to obtain relief under the Privacy Act, Judge Scott rejected the OMB guideline and corresponding HHS regulation as being "contrary to the Privacy Act and without force and effect." Id. at 1311.  Thus, his entry of injunctive relief was driven by a determination that release of individually identifiable Medicare provider reimbursement information was a violation of the Privacy Act, that the Plaintiffs had standing to challenge such a violation, and that the Privacy Act "confers the subject matter jurisdiction upon the Court to issue injunctive and declaratory relief." Id. at 1299 n.8.  On that basis, Judge Scott granted a "permanent injunction on behalf of plaintiffs." Id. at 1311 and n.10 (Court's decision premised upon "federal statutory grounds").

Despite Judge Scott's reasoned analysis, Plaintiffs, citing to the AMA Complaint, argue that they brought "challenges to specific 'final agency actions'" as contemplated by the APA. AMA and FMA Supplement at 3.  In the AMA and FMA Supplement, Plaintiffs identify the "1977 rule [providing] for disclosure of 'payments to individual physicians under the Medicare program'" published at 42 Fed. Reg. 14703-04, as the challenged agency action. Id. at 1-2. Pointing to the APA, they argue

> Faced with the agency's rule stating its intent to disclose physician-identifying Medicare reimbursement records on an ongoing basis, this Court acted well within its authority when it permanently enjoined the agency from carrying out those announced disclosures.

Id. at 2; see also Tr. at 11-18.

The failure in Plaintiffs' reasoning is that nothing in the FMA Injunction Order suggests that the Court reviewed the validity of HHS's proposed disclosure as a final agency action challenged under the APA.   No doubt, Judge Scott was well aware of the standard for reviewing agency action as some nine months before the entry of the FMA Injunction Order, and while the Court had this matter under advisement, Judge Scott decided <u>Westchester Gen. Hosp., Inc. v. HEW</u>, 464 F.Supp. 236 (M.D. Fla. 1979) in which he discussed the standard as well as the analysis at length.  <u>See</u> 464 F.Supp. at 251-258.  In <u>Westchester</u>, the plaintiff challenged a proposed disclosure of its cost reports, under an HHS published regulation, as prohibited by the Trade Secrets Act.  <u>See</u> <u>id.</u> at 238.   Reviewing HHS' proposed disclosure regulation, Judge Scott noted that to be valid,

> an administrative regulation must meet three substantive standards.  First, an administrative regulation must have a statutory source as its basis for issuance . . . Second, administrative regulations in order to be valid must also be consistent with, and not contrary to, "the statute under which they are promulgated". . . Finally, an administrative regulation must be reasonably related to advancing "the purposes of the enabling legislation."

<u>Id.</u> at 252 (internal quotations and citations omitted).  Nothing in the FMA Injunction Order suggests that the Court engaged in such an analysis of HHS's proposed disclosure or of the regulation authorizing the disclosure, 42 Fed. Reg. 14703-04.  <u>Compare</u> 464 F.Supp. at 253-254 (determining the validity of 20 C.F.R. § 422.435(c) by first determining its statutory source, then its consistency with the scope of the statute (at 256) and the published amendment authorizing that disclosure at (256-257)).   Indeed, he had no reason to do so.   In <u>Chrysler Corp.</u>, the Court, having determined that neither FOIA nor the Trade Secrets Act provided a right of action to enjoin a proposed disclosure, identified the APA as the proper vehicle for seeking such relief.   Judge Scott, however, determined that the Privacy Act

authorized a grant of injunctive relief.  Thus, review of the proposed disclosure under the APA was unnecessary.

Moreover, the analysis found in the final section of the Court's opinion entitled, "H. Plaintiffs' Standing as Individuals Under the Privacy Act" further confirms that Judge Scott did not enjoin HHS's proposed disclosure based upon a conclusion that 42 Fed. Reg. 14703-04 was a final agency action contrary to law, but rather did so because the proposed disclosure violated the Privacy Act.  See 479 F.Supp. at 1307.  In the FMA Injunction Order, after concluding that the proposed disclosure would violate the Privacy Act, Judge Scott addressed HHS's contention that Plaintiffs lacked standing to obtain relief under the Privacy Act.  In support of this contention HHS relied on the OMB guideline and corresponding HHS regulation (45 C.F.R. § 5b.1(c)), which excluded, individuals acting in an entrepreneurial capacity (e.g. as sole proprietorships, partnerships or corporation) from the protections of the Privacy Act.

Identifying the issue as "whether, as a matter of law, Plaintiffs are excluded from the class of individuals whose interests the statute (the Privacy Act) was designed to protect," Judge Scott initially concluded from the facial definition of the term "individual" that Plaintiffs would appear to be included within the scope of the statute's protection.  Next, upon review of the cited regulations, the Court explained:

> Insofar as Plaintiffs individually identified privacy interests with economic, business concerns of their sole proprietorship-like practices, the OMB guideline and HHS regulation would deny Plaintiffs' standing to assert the protections of the Privacy Act.  Hence, the legal lines of the issue are unmistakably drawn. Only if the OMB guideline and HHS regulation are in conflict with the purpose of the statute itself are Plaintiffs entitled to rely upon the Privacy Act to prevent the Secretary's proposed disclosure.

479 F.Supp. at 1308.  The Court then undertook a review of the OMB guideline and HHS regulation in accordance with the standards for reviewing administrative regulations.  See id. at 1308-1311.  Ultimately, the Court determined that the OMB guideline and corresponding HHS regulation (45 C.F.R. § 5b.1(e)) were in conflict with the Privacy Act "and to that extent null and void."  Id. at 1311.

Thus, with respect to the OMB guideline and the HHS regulation (45 C.F.R. § 5b.1(e)), the Court did engage in an analysis of the validity of the agency action.  The Court did so for the specific purpose of addressing HHS's challenge to Plaintiffs' entitlement to rely on the protections of the Privacy Act to prevent HHS's proposed disclosure.  Judge Scott did not conduct such a review, indeed he had no reason to conduct such a review, of HHS's proposed disclosure or of 42 Fed. Reg. 14703-04 because he determined that § 552a(g)(1)(D) authorized injunctive and declaratory relief.  Moreover, although the Court rejected the OMB guideline and corresponding HHS regulation as invalid, that rejection did not provide a basis for enjoining HHS's proposed disclosure.  Instead, rejection of the guideline and regulation simply established that Plaintiffs had standing under the Privacy Act, and thus, cleared the way for the Plaintiffs "to rely upon the Privacy Act to prevent the Secretary's proposed disclosure."  479 F.Supp. at 1308, 1311.

Upon careful review of the FMA Injunction Order, the Court is convinced that Judge Scott granted the relief at issue here as a remedy available for violation of the Privacy Act. Plaintiffs suggestion that in granting such relief, Judge Scott acted pursuant to the APA

-36-

simply finds no support in the record or Judge Scott's decision.[26]  Moreover, if there was any

question as to the legal basis for the 1979 FMA Injunction, Judge Scott answered it three

years later.  In the Modification Order, Judge Scott reiterated his conclusion that disclosure

of Medicare payment information about individually-named physicians was "prohibited by the

Privacy Act."  Modification Order at 1 (citing 479 F.Supp. at 1303-1311); see also id. at 3.

In granting the modification to clarify that HHS could release Medicare reimbursement

information to law enforcement agencies, "where such disclosure is authorized under 5

U.S.C. § 552a(B)(7)," Judge Scott stated that the 1979 FMA Injunction

> was premised upon federal statutory grounds.  479 F.Supp. at 1311, n.10.  The
> sort of disclosure which the decision addressed was that which is prohibited by
> the Privacy Act without the prior written consent of the affected individual.  479
> F.Supp. 1306-1307.  Hence, the Court's injunction did not cover disclosure
> pursuant to the Law Enforcement Exception, or any other exception set forth
> in subsection (b) of the Privacy Act, since the statute, by its terms, does not
> prohibit such disclosure, even where no written consent is obtained.  On the
> other hand, any disclosure made without the prior consent or the affected
> individual, which does not fall within the specific exceptions set forth in
> subsection (b) is prohibited by the Privacy Act and by the Court's injunction.

Modification Order at 3; see 5 U.S.C. § 552a(b).

In consideration of the foregoing, the Court concludes that in entering the 1979 FMA

Injunction, Judge Scott embraced the Privacy Act as providing the Court with jurisdiction to

enter broad declaratory and injunctive relief enjoining HHS from forever releasing individually

identifiable Medicare provider reimbursement information.  Having found that the Secretary's

---

[26]  Notably, when Plaintiffs first responded to the motions to vacate, they unambiguously stated
"This Court's permanent injunction was grounded in the Privacy Act, 5 U.S.C. § 552a(b)(2), and FOIA
Exemption 6, 5 U.S.C. 552(b)(6).  Neither statute has been amended since 1979 in any relevant respect.
Thus, the statutory basis for the injunction remains unchanged."  AMA and FMA Response at 8.
Nowhere in the AMA and FMA Response do Plaintiffs suggest that in entering the 1979 FMA Injunction,
the Court relied upon the APA.  See generally AMA and FMA Response.  It is only in the AMA and FMA
Reply that Plaintiffs first resort to the APA.  See AMA and FMA Reply at 2.

proposed disclosure would violate the Privacy Act, the Court entered the 1979 FMA Injunction as a remedy authorized by the Privacy Act.  479 F.Supp. at 1299 n.8,1311; 1979 FMA Injunction.

### C.    Has There Been a Significant Change in Law?

This Court has determined that the 1979 FMA Injunction was premised upon a finding that HHS's proposed disclosure violated the Privacy Act, and that the Court was authorized by the Privacy Act to enjoin such action, thus the Court must next consider the contention of the Intervenors and HHS that since the entry of the injunction, Privacy Act law has changed such that the Privacy Act would no longer permit the entry of such injunctive relief.  As previously discussed, these parties contend that the Eleventh Circuit's decision in Edison v. Dept. of the Army, 672 F.2d 840 (11th Cir. 1982), constitutes that significant change in the legal landscape which compels the conclusion that the current injunction, premised on the Privacy Act, cannot continue to stand.[27]

In 1982, the Eleventh Circuit for the first time considered the breadth of remedies authorized by the Privacy Act.  See Edison, 672 F.2d at 846.  In Edison, the plaintiff, an individual who had been passed over for a promotion, contended that the Army Board of Correction of Military records, acted arbitrarily and capriciously by failing to timely correct

---

[27]  Plaintiffs also argue that the relief granted in the 1979 FMA Injunction was authorized under the APA.  Because Edison did not limit the remedies under the APA, Plaintiffs assert that the Edison decision does not "warrant any change to this Court's injunction."  AMA and FMA Reply at 10.  As discussed supra in section IV.B., this Court is convinced that the 1979 FMA Injunction was premised on a finding that the proposed disclosure would violate the Privacy Act and that the Privacy Act authorized the Court to enjoin such a violation.  Thus, the Court need not consider whether the APA law has changed.  However, the Court determines that whether the relief granted by the FMA Injunction Order is sustainable under the APA is relevant to the Court's consideration of whether the relief sought here - a vacatur of the injunction - is properly tailored to the changed circumstances.  Thus, the Court will consider Plaintiffs contention that the 1979 FMA Injunction is sustainable as a remedy under the APA in section IV.D. below.

errors in his personnel records and sending his records to a promotion board.  See id. at 841.

After exhausting his administrative remedies, the plaintiff filed a complaint alleging violations

of the accuracy of records portion of the Privacy Act, 5 U.S.C. §§ 552a(e)(5), (g)(1)(C), and

(g)(1)(D).  Id. at 842.  The Court affirmed the district court's determination that the Army was

not unreasonable in its efforts to maintain proper records, and that the Army did not willfully

or deliberately violate the Privacy Act, thus, he was not entitled to damages.  Id. at 846.  The

Court also rejected plaintiff's argument that the Court had jurisdiction to grant other "more

meaningful relief with regard to his promotion," noting that the Court's authority to grant

injunctive relief under the Privacy Act is limited to (1) amending or correcting an individuals

record, 5 U.S.C. § 552a(g)(2)(A), and (2) ordering the production of improperly withheld

agency records, 5 U.S.C. § 552a(g)(3)(A).  Id. at 846-47 (citing Parks v. IRS, 618 F.2d 677,

683-84 (10th Cir. 1980), Cell Assocs., 579 F.2d at 1161-62, and Houston v. U.S. Dep't of

Treasury, 494 F.Supp. 24, 29 (D.D.C. 1979)).   The Court explained:

> The Act fails to authorize injunctive relief against violating the Act in other
> ways.  Where a statute provides for certain types of relief, but not others, it is
> not proper to imply a broad right to injunctive relief.

Id. (citing Parks, 618 F.2d at 684; Analysis of House and Senate Compromise Amendments

to the Federal Privacy Act, reprinted in 120 Cong.Rec. 40405, 40406 (1974)).   Thus, in

Edison, the Eleventh Circuit held that by authorizing entry of injunctive relief in only two

specific situations, see 5 U.S.C. § 552a(g)(2) and (3), the Privacy Act precludes other forms

of declaratory and injunctive relief.  Edison, 672 F.2d at 847.  Shortly thereafter, the Eleventh

Circuit reaffirmed the Edison holding in Clarkson v. IRS, 678 F.2d 1368 (11th Cir. 1982).

There, the Court stated:

> The Privacy Act expressly provides for injunctive relief for only two types of agency misconduct, that is, wrongful withholding of documents under subsection (d)(1) and wrongful refusal to amend an individual's record under subsection (d)(3).  See 5 U.S.C. § 552a(g)(2) & (3).  The remedy for violations of all other provisions of the Act is limited to recovery of damages upon a showing that the agency acted in an intentional or willful manner.  See 5 U.S.C. § 552a(g)(4)(1976); Edison v. Dep't of the Army, 672 F.2d 840 (11th Cir. 1982); Parks v. IRS, 618 F.2d 677 (10th Cir. 1980); Cell Assocs. v. Nat'l Inst., 579 F.2d 1155 (9th Cir. 1978).

Clarkson, 678 F.2d at 1375 n.11.

The limitation on the availability of injunctive relief reflected in Edison and Clarkson undermines the FMA Injunction Order's assertion that "the general grant of a right of action, of corresponding jurisdiction in the district courts, under s. 552a(g)(1)(D) confers the subject matter jurisdiction upon the Court to issue injunctive and declaratory relief."  479 F.Supp. at 1299, n.8.  As such, Intervenors RTMD and Alley, along with HHS, contend that Edison and Clarkson reflect a significant change in Privacy Act law that was unforeseen at the time of the 1979 FMA Injunction Order, and renders the continued enforcement of the 1979 FMA Injunction inequitable.

In the AMA and FMA Supplement, Plaintiffs contend that Edison did not effect a significant change in the law because it did not actually signify any change.  See AMA and FMA Reply at 10, n. 2.  In support of this proposition, Plaintiffs note that prior to entry of the 1979 FMA Injunction, the Ninth Circuit Court of Appeals had determined that the Privacy Act standing alone authorized only limited forms of injunctive relief.  See id. (citing Cell Associates v. National Institute of Health, 579 F. 2d. 1155 (9th Cir.1978)).  Plaintiffs note that the Edison court relied on Cell Associates, see id. (citing Edison, 672 F. 2d. at 846), and that

Judge Scott was well aware of <u>Cell Associates</u> when he entered the injunction because the FMA Injunction Order "repeatedly" cited <u>Cell Associates</u> in discussing the Privacy Act, <u>id.</u> (citing FMA Injunction Order, 479 F.Supp. at 1305-06).

However, the fact that the Court discussed <u>Cell Associates</u> in the FMA Injunction Order does not signal that the Court embraced the portion of that decision in which the <u>Cell Associates</u> court concluded that the Privacy Act did not authorize broad injunctive relief.  At that time, <u>Cell Associates</u>, was a non-binding decision from the Ninth Circuit, and appears to have the only published decision limiting the availability of injunctive relief under the Privacy Act.  <u>See</u> <u>Parks</u>, 618 F.2d at 682-84; <u>Houston</u>, 494 F.Supp. at 29; <u>Edison</u>, 672 F.2d at 846-47.  Judge Scott cited <u>Cell Associates</u> only in the context of the Court's review of the legislative history of the Privacy Act, and the relationship between FOIA Exemption 6 and the Privacy Act.  <u>See</u> FMA Injunction Order, 479 F.Supp. at 1305-06.  He did not mention it when discussing the Court's jurisdiction under the Privacy Act or the relief requested.

Review of the FMA Injunction Order unequivocally reflects that the Court did not consider <u>Cell Associates'</u> conclusion -- that § 552a(g)(1)(D) of the Privacy Act would not authorize injunctive relief – to be the state of the law in the Fifth Circuit.[28]  479 F.Supp. at 1299, n.8.  At that time, neither the former Fifth Circuit Court of Appeals nor the Supreme Court had considered the extent of equitable relief available under the Privacy Act.  As a matter of first impression, Judge Scott analyzed the statute.  He explained:

> 5 U.S.C. s 552a(g)(1)(D) of the Privacy Act is a general grant of a right of action to individuals covered by the Act.  Jurisdiction is expressly conferred

---

[28]  When the Court entered the FMA Injunction Order, Florida was part of the Fifth Circuit Court of Appeals.  On October 1, 1981, the large Fifth Circuit was divided into two circuits with the states of Alabama, Florida, and Georgia comprising the newly formed Eleventh Circuit Court of Appeals.

upon the district courts for civil actions against federal agencies that fail "to comply with any other provision" or "any other rule promulgated" under the Privacy Act, when such failure adversely affects the individual.

In contrast, 5 U.S.C. s 552a(g)(4)(A) is an express waiver of sovereign immunity by Congress, creating a right to obtain a damage remedy from the United States when one of its agencies intentionally or wilfully acts in violation of the Privacy Act and its applicable implementing regulations.

The general grant of a right of action, and of corresponding jurisdiction in the district courts, under s 552a(g)(1)(D) confers the subject matter jurisdiction upon the Court to issue injunctive and declaratory relief. The specific creation of a right to obtain damages against the United States, under s 552a(g)(4)(A), is a special waiver of sovereign immunity for the recovery of damages from the government, under egregious circumstances where a federal agency has acted with an intentional or wilful disregard for, and violation of, the provisions of the Privacy Act.

The two provisions are not inevitably conflicting. Courts have a duty to interpret statutes so that all of the provisions can be reconciled into a harmonious whole, without internal conflict or repugnancy, if possible.

Id. (citations omitted).  As such, it was Judge Scott's conclusion that § 552a(g)(1)(D) conferred upon the district court jurisdiction to issue injunctive and declaratory relief.  Id.[29]

Unchallenged, this interpretation of the Privacy Act remedies remained valid until the Edison decision.  In Edison, however, the Eleventh Circuit held for the first time that the equitable remedies available under the Privacy Act are limited to those specifically identified in the statute.  Thus, while the Privacy Act did not change, the construction by the Court of Appeals of the remedies available under the act did change, and changed in an important respect.[30]

---

[29]   Judge Scott was not alone in his belief that § 552a(g)(1)(D) authorized injunctive relief. See Harper v. United States, 423 F.Supp. 192, 196 (D. S.C. 1976)(discussing the pleading requirements to obtain an injunction or damages under § 552a(g)(1)(D) of the Privacy Act).

[30]   It is noteworthy that while the Edison decision affirmatively limited the equitable remedies available under the Privacy Act in the Eleventh Circuit as of 1982, the question of what remedies are available has continued to be an open issue addressed in other circuits over the intervening decades. See Reuber v. United States, 829 F.2d 133, 148 (D.C. Cir. 1987)(considering the issue and noting that "Courts have generally held that the Privacy Act's provisions are to be narrowly construed."); Wabun-Inini

(continued...)

This narrow construction, unequivocally prohibiting the type of injunctive relief granted in the FMA Injunction Order, constitutes a significant change in Privacy Act law.

### D.   Does the Change in Privacy Act Law Warrant Modification of the Injunction?

The Supreme Court has instructed that a court may grant Rule 60(b)(5) relief in light of a "significant change either in factual conditions or in law." Rufo, 502 U.S. at 384.  Further, the Court instructs that "a court may recognize subsequent changes in either statutory or decisional law." Agostini v. Felton, 521 U.S. 203, 215 (1997)(citing Railway Employees v. Wright, 364 U.S. 642, 652-53 (1961)(remaining citation omitted).  Indeed, a "court errs when it refuses to modify an injunction or consent decree in light of such changes." Id. (allowing vacatur of a continuing injunction "in light of a bona fide, significant change in subsequent law"); see also Rufo, 502 U.S. at 388 (a decree or injunction "must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law . . . [or] when the statutory or decisional law has changed

---

[30](...continued)
v. Sessions, 900 F.2d 1234 (8th Cir. 1990)(addressing the availability of injunctive relief as a matter of first impression, and noting that while some courts have refused to expand the available relief beyond that set forth in the statute others have not felt constrained by the statute.); Haase v. Sessions, 893 F.2d 370, 374, n.6 (D.C. Cir. 1990)(discussing the availability of specific injunctive relief and noting that "Congress presumably intended the district court to use its inherent equitable powers. . . .  'Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper exercise of that jurisdiction.'"); Brumley v. U.S. Dept. of Labor, 1990 WL 640002, Civ. A. No. 87-2220 at *1 (D.D.C. Dec. 5, 1990)(considering the issue while recognizing that Court's have narrowed the injunctive power of the Privacy Act); Doe v. Herman, 1998 WL 34194937, No. Civ. A. 97-0043-B at *4 (W.D. Va. Mar. 18, 1998)(recognizing that while some courts have concluded that the remedies set forth in the Privacy Act are the exclusive remedies, others have "employed a variety of reasons to conclude that the remedies recited in the Privacy Act do not necessarily comprise the entire realm of relief available").  The Edison Court's construction of the Privacy Act as providing only limited remedies resolved the question of the availability of injunctive relief in the Eleventh Circuit.  But, as reflected by the ongoing discussion in other circuits, that was new law in this Circuit, and it was undeniably a change in Privacy Act jurisprudence.

to make legal what the decree was designed to prevent." Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc., 413 F.3d 897, 903 (8th Cir. 2005)("[w]hen prospective relief is at issue, a change in decisional law provides sufficient justification for Rule 60(b)(5) relief"); Roberts v. St. Regis Paper Co., 653 F.2d 166, 173 (5th Cir. 1981)("a significant change in decisional law will permit a district court in its sound discretion to prospectively modify a permanent injunction under Rule 60(b)(5)"); Ensley Branch NAACP, 31 F.3d at 1564 (intervening Supreme Court decisions "substantially chang[ed] affirmative action jurisprudence . . . sufficiently alter[ing] the legal landscape to warrant modifications to the present [consent] decrees under Rufo").

In Agostini v. Felton, the Supreme Court addressed the application of Rule 60(b)(5) in a case where a party contended, in part, that a change in law warranted relief from a permanent injunction.  521 U.S. 203 (1997).  In its 1985 Aguilar v. Felton, 473 U.S. 402 (1985) decision, the Supreme Court held that the Establishment Clause barred city education officials from sending public school teachers into parochial schools to provide remedial education mandated by federal statute.  Agostini, 521 U.S. at 209.  A federal district court entered a permanent injunction reflecting that ruling.  Twelve years later, the school board and a new group of parents filed motions in the district court seeking relief under Rule 60(b)(5), to vacate the permanent injunction.  Id. at 214.  The case eventually made its way to the Supreme Court, where the board and parents, as petitioners, argued that three changes had occurred since entry of the permanent injunction which supported their request for Rule 60(b)(5) relief.  First, they argued that the "exorbitant costs" of complying with the permanent injunction constituted a significant factual development warranting modification.

-44-

Next, the petitioners contended that a change in the law was evidenced by the fact that a majority of Justices had expressed the view that Aguilar should be reconsidered or overruled; and last they asserted that Aguilar "had been undermined by subsequent Establishment Clause decisions." Id. at 215-16.

Applying the Rufo standard requiring there to be a "'significant change either in factual conditions or in law,'" the Court addressed "the threshold issue whether the factual or legal landscape ha[d] changed since we decided Aguilar." Id. at 215-16.  In doing so, the Court noted that "[a] court errs when it refuses to modify an injunction or consent decree in light of such changes." Id. at 215.  First, the Court determined that petitioners had "failed to establish the significant change in factual conditions required by Rufo," because the parties and the court were aware at the time of the Aguilar decision, that the permanent injunction would result in additional costs. Id. at 216.  Next, the Court rejected as a "significant change" in the law statements made by Supreme Court Justices in a non-binding context, which did not "furnish a basis for concluding that our Establishment Clause jurisprudence has changed." Id. at 217.  However, noting that "[a] court may recognize subsequent changes in either statutory or decisional law." id. at 215, the Court then "evaluate[d] whether Aguilar has been eroded by our subsequent Establishment Clause cases." Id. at 218.

Analyzing intervening Establishment Clause decisions, the Court concluded that the Aguilar decision, on which the permanent injunction was based, was "no longer good law," warranting relief under Rule 60(b)(5). Id. at 209, 217-18, 235, 237.  Because its intervening decisions had undermined the assumptions upon which its earlier decision in Aguilar relied, id. at 222, the Court reversed the lower courts' denial of relief, finding that the court's decision

"rest[ed] upon a legal principle that can no longer be sustained." Id. at 238.  The Court acknowledged that the "general principles" had not changed regarding the Establishment Clause, but rather, the Court's understanding of the criteria used to assess whether aid to religion has an impermissible effect had changed.  Id. at 222-223.  Accordingly, the Court ordered that the ten-year old injunction be vacated, "in light of a bona fide, significant change in subsequent law." Id. at 239-40.

With respect to the 1979 FMA Injunction, the Eleventh Circuit's 1982 decisions in Edison, 672 F.2d at 840, and Clarkson, 678 F.2d at 1368, effected a significant, substantive change in the law, affecting the rights and remedies available under the Privacy Act.  See generally In re Consol. Litig., 431 F. App'x at 844.  Indeed, subsequent to these decisions, it is evident that the Privacy Act no longer authorizes any of the injunctive relief granted in the 1979 FMA Injunction, much less the permanent ongoing prospective relief at issue here.  Thus, the obligation to forever withhold all such information "has become impermissible under federal law." See Rufo, 502 U.S. at 388.  Accordingly, in this case, as in Agostini, the Court finds that the 1979 FMA Injunction "rests upon a legal principle that can no longer be sustained, and thus, the injunction cannot be permitted to stand." Agostini, 521 U.S. at 238.

## E.    Is Vacatur of the Injunction Suitably Tailored to the Change in Privacy Act Law?

Having determined that the significant change in Privacy Act law warrants modification of the existing 1979 FMA Injunction, the Court must next determine whether the proposed remedy, here a vacatur of the injunction, is suitably tailored to the changed circumstances.

Rufo, 502 U.S. at 391, 393; see also Ensley Branch, N.A.A.C.P. v. Seibels, 31 F.3d 1548, 1563-64 (11th Cir. 1994).

Recognizing that post Edison, the Privacy Act alone would not authorize entry of the 1979 FMA Injunction, Plaintiffs contend that vacatur is not warranted because "the injunction was well within the scope of the authority conferred on this Court by the APA."  AMA and FMA Reply at 5; see also id. at 4 ("Although the Court did not explicitly state that it did so pursuant to its authority under the APA, the APA granted the Court the requisite authority to enjoin HHS unlawful conduct."); see also Tr. at 1178.  Plaintiffs argue that pursuant to Chrysler Corp. v. Brown, 441 U.S. 281 (1979), because HHS's proposed disclosure would violate the Privacy Act, it was "not in accordance with law" within the meaning of the APA. AMA and FMA Reply at 6-8.  They further argue that the APA authorizes a court to hold unlawful and set aside agency action found to be "not in accordance with law."  Id. at 6. Additionally, they note that "consistent with Chrysler" numerous courts have held that a person may file a reverse FOIA action under the APA to enjoin the government from making a disclosure. Id. at 8.  As such, Plaintiffs argue that the 1979 FMA Injunction remains proper because such relief is authorized under the APA.

In a "reverse FOIA" lawsuit, a plaintiff may seek protection from an agency's decision to release information to the public, pursuant to FOIA.  Doe v. Veneman, 380 F.3d 807, 810 (5th Cir. 2004)("[i]n a reverse-FOIA action, a plaintiff seeks to prevent a governmental agency from releasing information to a third party . . . under FOIA").[31]  The template for bringing such

---

[31]   See also, e.g. Doe v. Chao, 435 F.3d 492, 505 and n.17 (4th Cir. 2006)(an aggrieved person may enjoin a government agency from releasing personal records in violation of the Privacy Act pursuant to the APA); United Tech. Corp. v. U.S. Dep't of Defense, 601 F.3d 557, 559 (D.C. Cir. 2010)("[w]hen an

(continued...)

an action was set forth by the Supreme Court in Chrysler Corp. v. Brown.  There, a government contractor sued the United States Secretary of Defense to prevent disclosure of information supplied to the Defense Logistics Agency concerning its employment of women and minorities.  Chrysler, 441 U.S. 281.  Denominating the action as a "'reverse-FOIA'" suit, the Court held that FOIA was exclusively a disclosure statute and afforded no right private right of action to enjoin agency disclosure of information.  Chrysler, 441 U.S. at 285, 292-94; see FMA, 479 F.Supp. 1301 (recognizing that the "FOIA exemptions do not forbid the disclosure of information, and therefore do not authorize an inverse-FOIA action for injunctive relief").  The Court also determined that Chrysler did not have a private right of action to enjoin disclosure under the Trade Secrets Act, 18 U.S.C. § 1905.  Chrysler, 441 U.S. at 316.  However, although FOIA would not permit a private party to enjoin disclosure, the Court explained that a party seeking to prevent disclosure may seek judicial review of an agency's decision to release information under the APA, and that the Court has federal question jurisdiction to consider the claim.  Id. at 317-18 & n. 47.

---

[31](...continued)
agency determines, pursuant to a FOIA request, to disclose information gathered from a non-governmental source, the source may contest the disclosure as arbitrary and capricious or not in accordance with law under the [APA]" (citing 5 U.S.C. §§ 702, 706(2))); OSHA Data/CIH, Inc. v. U.S. Dep't of Labor, 220 F.3d 153, 160 (3d Cir. 2000)(an agency can be sued "through the vehicle of the [APA] for allowing disclosure of information that was in fact covered by one of the nine exemptions to FOIA," commonly referred to as a "'reverse FOIA'" suit (emphasis omitted; citing Chrysler Corp., 441 U.S. at 317-18)); Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1185 (8th Cir. 2000)("reverse FOIA" cases are brought "under the APA, which provides that '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . , is entitled to judicial review thereof'" (quoting 5 U.S.C. § 702)); Brancheau v. Sec'y of Labor, No. 6:11-cv-1416-Orl-31DAB, 2012 WL 1072227, at *2 (M.D. Fla. March 29, 2012)("FOIA does not provide a private right of action to enjoin disclosure"); Brancheau v. Sec'y of Labor, No. 6:11-cv-1416-Orl-31DAB, 2012 WL 140239, at *2 (M.D. Fla. Jan. 18, 2012)("FOIA is a disclosure statute and does not provide a right of action to enjoin disclosure," but the "APA provides [the] Court with jurisdiction to review 'final agency action for which there is no other adequate remedy in a court'" (emphasis omitted, and quoting 5 U.S.C. § 704)).

Under the APA, an agency's final action may be set aside "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Canadian Commercial Corp. v. Dep't of the Air Force, 514 F.3d 37, 38-39 (D.C. Cir. 2008)(quoting 5 U.S.C. § 706(2)(A)); see also United Tech. Corp. v. U.S. Dep't of Defense, 601 F.3d 557, 562 (D.C. Cir. 2010); Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1184 (8th Cir. 2000). "Thus, a district court may review an agency decision to release information under FOIA and set aside that decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Doe v. Veneman, 380 F.3d at 813-14.  The focal point for such judicial review of an agency action "should be the administrative record." Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers, 87 F.3d 1242, 1246 (11th Cir. 1996)(citing Camp v. Pitts, 411 U.S. 138, 142 (1973)).

Even if the information proposed for release falls within a FOIA exemption, however, the agency may still have the discretion to opt to disclose the information.  This is because FOIA exemptions "are exemptions from mandatory disclosure only; they do not prohibit agency disclosure." Campaign for Family Farms, 200 F.3d at 1185 (citing Chrysler, 441 U.S. at 293).  Thus, to establish that disclosure of information would be arbitrary and capricious under the APA, a plaintiff "must show that the release of the information at issue [is] somehow unlawful.'" Brancheau v. Sec'y of Labor, No. 6:11-cv-1416-Orl-31DAB, 2012 WL 140239, at *4 (M.D. Fla. Jan. 18, 2012)(citation omitted).  When Exemption 6 of FOIA is implicated, that "other law" requiring the withholding of the information can be the Privacy Act. "The net effect of the interaction between the two statutes is that where the FOIA requires disclosure, the Privacy Act will not stand in its way, but where the FOIA would permit

withholding under an exemption, the Privacy Act makes such withholding mandatory upon the agency." News-Press v. U.S. Dep't. of Homeland Sec., 489 F.3d 1173, 1189 (11th Cir. 2007); see also Cochran v. United States, 770 F.2d 949, 954-55 (11th Cir. 1985).

Nevertheless, under the APA, "[a] plaintiff seeking to prevent disclosure under FOIA has no remedy until the agency determines that it will release the requested information." Brancheau, 2012 WL 140239, at *2.[32] "In the absence of final agency action,[33] [the] Court lacks subject matter jurisdiction to review a decision under the APA." Brancheau v. Sec'y of Labor, No. 6:11-cv-1416-Orl-31DAB, 2012 WL 1072227, at *2 (M.D. Fla. March 29, 2012); see also Doe v. Veneman, 380 F.3d at 814 (a "plaintiff seeking to prevent disclosure under FOIA may seek judicial review of an agency's decision to release information in response to a FOIA request, but a plaintiff has no remedy until the agency determines it will release requested information"); cf. Gulf Oil Corp. v. Brock, 778 F.2d 834, 841 (D.C. Cir. 1985)("each FOIA request must be evaluated independently to see if the Trade Secrets Act requires [the

---

[32]   For example, in Chrysler, "the government agency had already made a decision to release the specific documents at issue, prompting Chrysler to sue to block the disclosure." Brancheau v. Sec'y of Labor, No. 6:11-cv-1416-Orl-31DAB, 2011 WL 4105047, at *2 (M.D. Fla. Sept. 15, 2011)(citing Chrysler, 441 U.S. at 287). "Thus, even though the disclosure had not yet occurred, there was final agency action that could be challenged under the APA." Id.

[33]   "If the claim attacks an agency's action, instead of its failure to act, and the statute allegedly violated does not provide a private right of action, then the 'agency action' must also be a 'final agency action.'" Fanin v. U.S. Dep't of Veterans Affairs, 572 F.3d 868, 877 (11th Cir. 2009)(quoting 5 U.S.C. § 704). "'To be considered "final," an agency's action: (1) must mark the consummation of the agency's decisionmaking process - it must not be of a merely tentative of interlocutory nature; and (2) must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" Id. (citations omitted). "Federal jurisdiction is lacking 'when the administrative action in question is not "final" within the meaning of 5 U.S.C. § 704.'" Jallali v. Sec'y , U.S. Dep't of Educ., 437 F. App'x 862, 865 (11th Cir. 2011)(quoting Nat'l Parks Conservation Ass'n. v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003)). Thus, APA challenges are made to "specific 'final agency actions,'" and "[a] proper analysis must go claim by claim, identifying each one and determining whether it is based on a 'final agency action.'" Fanin, 572 F.3d at 877; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 894 (1990)(APA "final agency action" requirement provides for a "case-by-case approach").

Department of Labor] to withhold the documents").  Thus, "[w]ithout an agency decision to release personal information . . . , an injunction enjoining such a release constitutes an impermissible advisory opinion."  Doe v. Veneman, 380 F.3d at 819.  In the same way, an injunction in a reverse FOIA action properly enjoins disclosure of the information at issue in that action only, not "any" or "all" substantially similar information.  See Gulf Oil Corp., 778 F.2d at 842-43.

Moreover, while the APA authorizes a court to enjoin a specific final agency decision it finds arbitrary, capricious or contrary to law, the APA does not afford a vehicle for enjoining possible future agency actions.  Alabama v. Ctr. for Medicare and Medicaid Serv., 674 F.3d 1241, 1245 (11th Cir. 2012)(refusing to consider additional challenges to an agency's now-vacated policy because it "would be nothing more than an advisory opinion regarding 'contingent future events that may not occur as anticipated, or indeed may not occur at all'" (citation omitted)).  In Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990), the Supreme Court explained:

> Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect.  Toilet Goods Assn., 387 U.S. at 164-166, 87 S.Ct. at 1524-1526.

Id. at 94.  As such, the Court held that future contingent agency actions "yet to be taken . . . cannot be laid before the courts for wholesale correction under the APA," simply because one action is ripe for review.  Id. at 893-94.  Interpreting Lujan, the Eleventh Circuit has opined: "Systemic improvement and sweeping actions are for the other branches, not for the courts under the APA."  Fanin v. United States Dep't of Veteran's Affairs, 572 F.3d 868 (11th

Cir. 2009)(citing Lujan, 497 U.S. at 894; Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004)).  Thus, "[w]here a plaintiff seeks review pursuant to the APA, an injunction that enjoins an agency from disclosing more than has been requested or more than the agency has determined to release is overbroad because it exceeds the legal basis for the lawsuit." Doe v. Veneman, 380 F.3d at 819.

Here, the prospective application of the 1979 FMA Injunction cannot be sustained as relief available under the APA.  As the Eleventh Circuit explained:

> The language of the [1979] FMA Injunction is broad.  It permanently enjoins disclosure of "any list" of annual Medicare reimbursement amounts, "for any years," if disclosing it would identify members of the recertified class.  The declaration paragraph of the injunction declares contrary to federal law "[a]ny such disclosure" of annual Medicare reimbursement amounts "in a manner that would personally and individually identify the providers of services."  The repeated use of the word "any" makes clear that the scope of the injunction is not limited to the precise method of disclosure that was proposed in 1977.

Alley v. U.S. Dep't of Health and Human Svcs., 590 F.3d 1195, 1207 (11th Cir. 2009).  This broad, forward reaching injunction, which bars HHS from ever "disclosing any list of annual Medicare reimbursement amounts, for any years," goes far beyond the relief available under the APA.  Certainly, the APA would authorize a court to set aside or declare null and void the 1977 notice published in the Federal Register (42 Fed. Reg. 14703), which amended HHS's regulations for disclosure pursuant to FOIA.  Equally evident is the fact that the APA would authorize the Court to enjoin HHS from making the proposed disclosure - - that is the April 1978 disclosure of 1977 Medicare data which was announced in November 1977.  The 1979 FMA Injunction, however, goes much farther than that; permanently enjoining HHS from ever disclosing "any list" of Medicare reimbursement data in a way that individually identifies the service providers.  Such far reaching relief was not authorized under the APA at the time the

1979 FMA Injunction was entered nor is it appropriate now.[34]  Thus, Plaintiffs contention that the FMA Injunction should remain in place as such relief would be available under the APA is unavailing.

The Court concludes that vacatur of the 1979 FMA Injunction is appropriate, and "suitably tailored to the changed circumstance" in this case,  Rufo, 502 U.S. at 383.  Post Edison, it is beyond dispute that the 1979 FMA Injunction provides injunctive relief not authorized by the Privacy Act.  As such, its continued enforcement, lacking in a legal basis, is no longer equitable.   Moreover, continued enforcement of the 1979 FMA Injunction exemplifies the very inequities the subsequent change in Privacy Act law, and concurrent development of the law relating to reverse FOIA actions, was designed to prevent.  Before the Court is an injunction which forever prohibits a federal agency or any other court from evaluating the merits of a FOIA request and/or release of information pursuant to FOIA, regardless of whether the nature of the information or surrounding factual circumstances have changed.  Moreover, the forward-reaching injunction enjoins an agency policy that no longer exists, and anticipates possible future agency action that may never come to pass.  Such an injunction is impermissible under the Privacy Act and conflicts with the objectives of FOIA to encourage disclosure.

---

[34]  Indeed, upon review of the FMA Complaint and the AMA Complaint, it appears that the relief granted by way of the 1979 FMA Injunction went beyond the disclosure challenged by the parties in the lawsuit.  In the FMA Complaint, the FMA Plaintiffs described the information that HHS proposed to disclose on April 30, 1978, as "the Information" and sought to enjoin HHS from disclosing that information.  See FMA Complaint ¶¶ 13-18.  Similarly, the AMA Plaintiffs identified the proposed disclosure in April 1978 as "the List" and sought a declaration that the disclosure of the List was unlawful and requested injunctive relief barring its disclosure.  See AMA Complaint ¶¶ 14, 15, 20-22.

Indeed, the reverse FOIA jurisprudence, counsels that long-term broad prospective injunctive relief enjoining an agency from releasing a generalized category of information is detrimental to the public interest, and for this reason also, no longer equitable.  The premise of a reverse FOIA claim is founded upon judicial review of an agency's decision to release particular information under FOIA, and a determination of whether, under the APA, the agency's decision was arbitrary, capricious, or contrary to law.  That review applies to particular actions and does not encompass future agency conduct which may or may not occur.  Moreover, it requires that the agency decision be evaluated on a case by case basis. See Fanin, 572 F.3d at 877.  The effect of the 1979 FMA Injunction is to prohibit any future evaluation of whether or not any individualized Medicare provider reimbursement data may be accessed by the public, foreclosing any consideration of relevant factual conditions including any which may have changed in the past 33 years, or the next 33 years, and which may affect the balance between competing public and private interests.  Vacatur of the injunction permits the type of case by case review envisioned by the APA in the future.

Additionally, vacatur of the 1979 FMA Injunction would leave in place the HHS policy, adopted in 1980, concluding that "the public interest in the individually identified payment amounts is not sufficient to compel disclosure in view of the privacy interests of the physicians found compelling by the courts." 45 Fed. Reg. 79172.  HHS represents that it has consistently maintained the position that the individually identifiable Medicare reimbursement data should not be released, based on Exemption 6 to FOIA.  HHS Response at 18-19 (citing Consumers' Checkbook, 554 F.3d at 1049 and Alley, 590 F.3d at 1200-1201). Thus, vacatur of the injunction will not result in an immediate release of the information at issue.  Instead,

Intervenors will have to submit a FOIA request for specified information.  In the event HHS denies the FOIA request for release of the information, Intervenors would be required to exhaust their administrative remedies, and then file a direct action pursuant to FOIA seeking injunctive relief in the form of release of the information.  Plaintiffs would then be in a position to defend against Intervenors' FOIA claim based upon the current factual circumstances and the applicable law.  See e.g. Consumers' Checkbook, 554 F.3d at 1048-49.

If, on the other hand, HHS determines that it is not constrained by Exemption 6, or any other FOIA exemption, and decides that the information may be released pursuant to FOIA, Plaintiffs would be able to file a reverse FOIA claim for review of that agency decision pursuant to the APA.  See e.g. Doe v. Veneman, 380 F.3d at 810.  This judicial review would be focused on the particular agency decision, based on an administrative record, and evaluating the then existing competing interests implicated by the disclosure.  That Plaintiffs would have to litigate a possible future HHS decision to release Medicare reimbursement information is insufficient to circumvent the legal procedure in place for judicial review.  See Gulf Oil, 778 F.2d at 842.  Indeed, as noted in Lujan, the case by case approach required by the APA "is understandably frustrating.  But this is the traditional, and remains the normal, mode of operation of the courts."  Lujan, 497 U.S. at 894.  In light of the significant change in Privacy Act law, vacatur of the broad permanent injunction is the proper remedy and will allow for appropriate agency consideration and, if necessary judicial review, of future decisions to release or withhold the information at issue in this action.

## V.    **Conclusion**

The question before the Court at this stage of the proceedings is not whether the information protected from disclosure by the 1979 FMA Injunction should be disclosed now or ever.  It is not whether the injunction was wrongly or rightly entered in 1979.  The narrow question before this Court is whether "'a significant change in either factual conditions or in law' renders continued enforcement [of the 1979 FMA Injunction] 'detrimental to the public interest.'"  Horne v. Flores, 557 U.S. 433, 447 (2009)(quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 884 (1992).  The Court has determined that the Eleventh Circuit's proscription of available Privacy Act relief in Edison constitutes a "bona fide, significant change in subsequent law," see Agostini, 521 U.S. at 239, which renders continued enforcement of the 1979 FMA Injunction inequitable and detrimental to the public interest. The Privacy Act law, upon which the Court's 1979 FMA Injunction is based, is "no longer good law," and thus the permanent injunction "rests upon a legal principle that can no longer be sustained," warranting relief under Rule 60(b)(5).  Id. at 235, 238.

Rule 60(b)(5) "specifically contemplates the grant of relief in the circumstances presented here. . . ," Agostini, 521 U.S. at 239, involving "bona fide changes in . . . decisional law."  Id.  A judgment should not be permitted to stand if it "rests upon legal principle that can no longer be sustained."  Id., at 238.  For this reason, the 1979 FMA Injunction is due to be vacated to the extent that it shall no longer enjoin disclosure of Medicare reimbursement data.[35]  Additionally, the Court's 1979 Declaratory Judgment, declaring that "[a]ny such

---

[35] Because the Court has determined that the change in Privacy Act law warrants vacatur of the 1979 FMA Injunction, the Court will not delve into the parties' arguments regarding whether the factual circumstances, such as the competing public and private interests or the character of the data sought,

(continued...)

disclosure of annual Medicare reimbursement amounts, for any years, in a manner that would personally and individually identify the providers of services under the Medicare program . . . is declared to be contrary to law," is due to be vacated.[36]

In accordance with the foregoing, it is hereby

**ORDERED**:

1.      Intervenors Jennifer D. Alley and Real Time Medical Data's Motion to Vacate Permanent Injunction (Doc. 55) is **GRANTED**.

2.      Intervenor Dow Jones & Company, Inc.'s Motion to Vacate Permanent Injunction (Doc. 56) is **GRANTED**.

3.      The Final Declaratory Judgment and Permanent Injunction, entered in this case on October 22, 1979, is **VACATED**, as to its prospective effect.

4.      The Clerk of the Court is directed to enter judgment in accordance with this Order and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 31st day of May, 2013.

_Marcia Morales Howard_
**MARCIA MORALES HOWARD**
United States District Judge

Copies to:
Counsel of Record

---

[35](...continued)
have also changed in the 33 year interim since entry of the 1979 FMA Injunction. Those questions are better left for consideration on a fully developed record in a future FOIA or reverse FOIA action.

[36] Because the pending motions are resolved under Rule 60(b)(5), the Court need not analyze the motions pursuant to Rule 60(b)(6). See supra note 17.